**NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY and Lee Thomas, Administrator, U.S. Environmental Protection Agency, Respondents.**

No. 85–1150.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1986.

Decided Nov. 4, 1986.

David D. Doniger, Washington, D.C., for petitioner.

Earl Salo, Atty., U.S. E.P.A., with whom Francis Blake, Gen. Counsel, Charles Carter, Asst. Gen. Counsel, U.S. E.P.A., and Margaret N. Strand, Michael W. Steinberg, and Mark P. Fitzsimmons, Attys. U.S. Dept. of Justice, Washington, D.C., were on brief, for respondents.

Robert Brager, with whom Gary H. Baise, Jerome H. Heckman and Peter L. de la Cruz, Washington, D.C., were on brief, for intervenor Vinyl Institute.

Arthur F. Sampson, III, and Neil J. King, Washington, D.C., were on the joint brief for amici curiae American Petroleum Institute and Chemical Mfrs. Ass'n, urging affirmance. Stark Ritchie, Martha Beauchamp, and Arnold Block, Washington, D.C., entered appearances for amicus curiae American Petroleum Institute. David F. Zoll and Frederic P. Andes, Washington, D.C., entered appearances for amicus curiae Chemical Mfrs. Associations.

Robert V. Percival, Washington, D.C., was on brief for amicus curiae Environmental Defense Fund, urging reversal.

Before EDWARDS and BORK, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge BORK.

Separate opinion concurring in part and dissenting in part filed by Senior Circuit Judge WRIGHT.

BORK, Circuit Judge:

Petitioner Natural Resources Defense Council ("NRDC") challenges the Environmental Protection Agency's ("EPA" or "agency") withdrawal of proposed regulations governing the emissions of vinyl chloride. The NRDC claims that section 112 of the Clean Air Act, 42 U.S.C. § 7412 (1982), pursuant to which the EPA regulates hazardous pollutants such as vinyl chloride, allows consideration of no factors other than health in setting the level of regulation. Because the Administrator relied on economic and technological factors in withdrawing the proposed regulations, the NRDC contends that the withdrawal was arbitrary and capricious and asks that we vacate the agency's action and remand for further proceedings. We believe, however, that the statute vests the Administrator with some discretion in setting regulations under section 112, but does not specify precisely how that discretion is to be exercised. Accordingly, under *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must uphold the agency's selection of factors to employ in fleshing out its authority if we find the agency's choice a reasonable one. Because we believe that the agency's choice of economic and technological feasibility was reasonable, we affirm the agency's action.

## I.

Section 112 of the Clean Air Act provides for regulation of hazardous air pollutants, which the statute defines as "air pollutant[s] to which no ambient air quality standard is applicable and which in the judgment of the Administrator cause[ ], or contribute[ ] to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 7412(a)(1) (1982). The statute requires the Administrator to publish a list containing each hazardous pollutant for which he intends to adopt an emission standard, to publish proposed regulations and a notice of public hearing for each such pollutant, and then, within a specified period, either promulgate an emission standard or make a finding that the

particular agent does not amount to a hazardous air pollutant. *See* 42 U.S.C. § 7412(b) (1982). The statute directs the Administrator to set any emission standard promulgated under section 112 "at the level which in his judgment provides an ample margin of safety to protect the public health." 42 U.S.C. § 7412(b)(1)(B) (1982). The question before us is whether this standard permits the Administrator to consider economic and technological feasibility.

This case concerns vinyl chloride regulations. Vinyl chloride is a gaseous synthetic chemical used in the manufacture of plastics and is a strong carcinogen. In late 1975, the Administrator issued a notice of proposed rulemaking to establish an emission standard for vinyl chloride. 40 Fed. Reg. 59,532 (1975). In the notice, the EPA asserted that available data linked vinyl chloride to carcinogenic, as well as some noncarcinogenic, disorders and that "[r]easonable extrapolations" from these data suggested "that present ambient levels of vinyl chloride may cause or contribute to ... [such] disorders." *Id.* at 59,533. In so deciding, the agency noted that vinyl chloride was "an apparent non-threshold pollutant," which means that it appeared to create a risk to health at all non-zero levels of emissions, but that scientific uncertainty, due to the unavailability of dose-response data, made it impossible to establish any definite threshold level of adverse effects to human health. *Id.* at 59,534. In the face of this uncertainty, the EPA decided that setting emissions at the level achievable by the best available technology would substantially reduce emissions and provide stringent regulation that satisfied the command of providing "an ample margin of safety." *Id.*

On October 21, 1976, the EPA promulgated final rules for vinyl chloride, expected to reduce emissions to 5% of unregulated levels. 41 Fed.Reg. 46,560 (1976). In promulgating these standards, the EPA stated that the "purpose of the standard is to minimize vinyl chloride emissions ... to the level attainable with best available control technology." *Id.* The EPA also noted that it believed section 112 permits the Administrator to "assure that the costs of control technology are not grossly disproportionate to the level of emission reduction achieved." *Id.* at 46,562. The Environmental Defense Fund ("EDF") filed suit challenging the rules on the basis that section 112 required the Administrator to rely exclusively on health, and not at all on technological, considerations in standard setting. The EDF and EPA settled the suit, however, upon EPA's agreement to propose new and more stringent rules for vinyl chloride and to establish an ultimate goal of zero emissions.

The EPA satisfied its obligations under the settlement agreement by proposing new regulations on June 2, 1977. While the proposal sought to impose more strict regulation and establish an aspirational goal of zero emissions, the EPA made it clear that it considered its previous regulations valid and reemphasized its view that the inability scientifically to identify a threshold of adverse effects did not require prohibition of all emissions, but rather permitted regulation at the level of best available technology. 42 Fed.Reg. 28,154 (1977). The EPA received comments on the proposal, but for over seven years took no final action. On January 9, 1985, the EPA withdrew the proposal. Noting that certain aspects of the proposed regulations imposed "unreasonable" costs and that no control technology "has been demonstrated to significantly and consistently reduce emissions to a level below that required by the current standard," 50 Fed.Reg. 1182, 1184 (1985), the EPA concluded that it should abandon the 1977 proposals and propose in their place only minor revisions to the 1976 regulations.

This appeal followed.

## II.

We must address at the outset two procedural challenges to the NRDC's bringing this petition for review. First, an industry intervenor, the Vinyl Institute, argues that the petition for review is not timely filed. Second, the EPA argues that NRDC has

failed to exhaust its administrative remedies and that we must, therefore, dismiss its petition for review. We address these contentions in turn.

**A.**

■ The Vinyl Institute argues that this court has no jurisdiction in this case because the statute provides that "[a]ny petition for review ... must be filed within sixty days from the date notice of [the] promulgation, approval, or action appears in the Federal Register, except that if the petition is based on grounds arising after such sixtieth day, then any petition for review ... shall be filed within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1) (1982). According to the intervenor, the NRDC seeks to review in this case not the 1985 withdrawal of the proposed amendments, but the 1976 standards themselves. Because that statutory issue did not arise within sixty days before the filing of review, the intervenor claims the petition is untimely. Under *Montana v. Clark*, 749 F.2d 740, 744 (D.C. Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985), "an agency decision not to amend long-standing rules after a notice and comment period is reviewable agency action." Thus, if the petition for review, filed within sixty days of the withdrawal of the proposed amendments, amounts to a genuine challenge to the withdrawal of the proposed regulations, it was timely filed. If, by contrast, Vinyl Institute is correct in asserting that this appeal in fact constitutes a substantive attack on the 1976 regulations, we must dismiss the suit as untimely filed. *See Professional Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1217–18 n. 2 (D.C. Cir.1983). We believe the former is the more accurate characterization of this lawsuit.

The contention that this case amounts to a back-door challenge to the 1976 regulations is refuted by the substance of petitioner's brief and the relief requested. The petitioner states that "[i]n withdrawing the proposed amendments EPA violated the law by employing cost-benefit and techno-logical feasibility tests that are prohibited by the Clean Air Act." Brief for NRDC at 3. Indeed, the brief makes explicit that the petitioner is specifically challenging the EPA's reliance on cost and technological feasibility tests in its withdrawal of the proposed amendments. *Id.* at 12–13. Most importantly, the petitioner does not seek to have us overturn the 1976 standards, but rather seeks to have us overturn the 1976 standards, but rather seeks to have us vacate the EPA's decision to withdraw the amendments and order agency action consistent with our opinion. *See* Brief for NRDC at 36–37. While, if we were to agree with the NRDC that the statute prohibits any cost or technological considerations in standard setting, our rationale might indicate the invalidity of the 1976 regulations, our decision would not of itself invalidate those regulations. We think it clear, therefore, that the NRDC has challenged the 1985 withdrawal of the proposed amendments. The petition for review is timely.

**B.**

■ The EPA argues that the petitioner has failed to exhaust available administrative remedies and asks us to dismiss the petition for that reason. Congress included in section 307(d) of the Clean Air Act a statutory requirement of exhaustion, providing that "[o]nly an objection to a rule or procedure that was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B) (1982). This statutory requirement of exhaustion, however, does not apply here. The statute states that "[t]he requirements of ... subsection [307(d) of the Act] shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977." 42 U.S.C. § 7607(d)(11) (1982). The withdrawal of the proposed amendments now before us constitutes final agency action on the notice of proposed rulemaking that came out on June 2, 1977. *See* 42 Fed.Reg. 28,154 (1977). Thus, even if we assume that the action of withdrawing a proposed

rule amounts to a "rule" for the purposes of section 307(d)'s timing provision, the proposal withdrawn here was issued before the date section 307(d) took effect. Accordingly, we must look to the common law doctrine of exhaustion of remedies. *See Safir v. Kreps*, 551 F.2d 447, 452 (D.C. Cir.), *cert. denied*, 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977). The result, however, is the same.

Courts have long required that a party seeking review of agency action exhaust its administrative remedies before seeking judicial relief. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). In the case before us, the administrative remedy was participation in the rulemaking proceedings during the comment period. Indeed, this court generally requires such participation as a prerequisite to petitioning for direct review of the resulting regulations. *See Environmental Defense Fund v. EPA*, 598 F.2d 62, 91 (D.C. Cir. 1978).

The NRDC did not participate in the rulemaking proceedings in this case, but argues that we should not dismiss its petition for review because the agency in fact considered the statutory issue pressed on appeal. The NRDC is correct. This court has excused litigants from their exhaustion obligations as to a particular issue so long as the agency in fact considered the issue. *See Washington Association for Television & Children v. FCC*, 712 F.2d 677, 682 n. 10 (D.C. Cir.1983); *Etelson v. Office of Personnel Management*, 684 F.2d 918, 923 (D.C. Cir.1982); *ASARCO, Inc. v. EPA*, 578 F.2d 319, 320–21 n. 1 (D.C. Cir.1978); *Safir v. Kreps*, 551 F.2d at 452. Thus, courts have waived exhaustion if the agency "has had an opportunity to consider the identical issues [presented to the court] ... but which were raised by other parties," *see Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 951 (6th Cir.1971), or if the agency's decision, or even a dissenting opinion, makes it clear that the agency had "the opportunity to consider" "the very argument pressed" by the petitioner on judicial review. *Office of Communica-*

*tion of the United Church of Christ v. FCC*, 465 F.2d 519, 523 (D.C. Cir.1972).

In this case, the issue whether the clear meaning of section 112 precluded the consideration of cost or technological feasibility in standard setting was adequately raised before the agency. First, the 1977 proposed amendments were the product of the settlement of a lawsuit challenging the previous vinyl chloride standards as having impermissibly taken consideration of feasibility into account. This demonstrates that the agency had notice of the argument that the statute precluded such considerations, and that the agency did or should have taken this into account in reaching a final decision on the proposed amendments. Indeed, in its notice of proposed rulemaking, the EPA remarked that "[t]he [1976] vinyl chloride standard has been criticized for allegedly placing unwarranted emphasis on technological rather than health considerations." 42 Fed.Reg. 28,154 (1977). The notice then continued by discussing the "ample margin of safety" language, the potential problem, under this standard, of having to shut down an entire industry that produces a non-threshold pollutant, and the way the proposed amendments resolved the problem by moving toward zero emissions without banning vinyl chloride. *Id.* Thus, it is clear that the EPA considered the question whether the language of section 112 requires a purely health-based standard.

Moreover, EDF explicitly raised the issue before the EPA in its comments on the proposed amendments. In this respect, the EDF stated:

The proposed amendments represent a true compromise between what EDF could have pressed for in court and the existing standard. Section 112 of the Clean Air Act requires that emission standards for hazardous air pollutants be set "at a level which in the judgment of the Administrator provides an ample margin of safety to protect the public health from such hazardous air pollutants." It clearly requires a health-

linked, not a technology-based standard. Yet, inconsistent with the statutory requirement, the original standards were based on what EPA believed industry could accomplish with best available technology.... EPA recognized that vinyl chloride is "an apparent non-threshold pollutant" which creates a risk to public health at all levels. Had the case gone to trial, EDF would have taken the position that § 112 required a zero emission standard, the only standard adequate to provide the required margin of safety for a non-threshold pollutant. Instead, EDF settled for a compromise which establishes a goal of zero emissions and requires industry to move one step closer to that goal.

J.A. at 72–73. EDF's comments contain other, similar references, such as the assertion, in response to cost arguments raised by the industry, that "the statute EPA operates under requires regulations based on protection of health and not cost and technology concerns." *Id.* at 83. Thus, the EPA had before it the question whether the statute permits considerations of cost and technology in setting standards, and it had the opportunity to consider that question in deciding to withdraw the proposed amendments. Accordingly, we may not dismiss on the grounds of failure to exhaust.

The EPA also suggests, however, that we should be "especially" loath to allow this petition for review because the "NRDC chose not to participate *at all* in *any* of the administrative proceedings on vinyl chloride." Brief for EPA at 12 (emphasis in original). This merely restates the proposition that the NRDC has failed to exhaust its administrative remedies. None of the cases relied upon by the EPA suggests that exceptions to exhaustion have any less applicability in the case of a wholly absent party than in other exhaustion contexts. *See Environmental Defense Fund v. EPA*, 598 F.2d 62, 91 (D.C. Cir.1978); *Nader v. Nuclear Regulatory Commission*, 513 F.2d 1045, 1054–55 (D.C. Cir.1975). This is not a case in which the statute conditions a party's ability to obtain judicial review upon its participation in the rulemaking proceedings. *See Gage v. Atomic Energy Commission*, 479 F.2d 1214, 1218 (D.C. Cir.1973). The jurisdictional provision of the Clean Air Act imposes no such prerequisite, and, in fact, employs rather permissive language not specifying who may bring review. *See* 42 U.S.C. § 7607(b) (1982) ("A petition for review of action of the Administrator in promulgating ... any emission standard or requirement under section 7412 ... may be filed ... in the United States Court of Appeals for the District of Columbia."). The NRDC's total abstention from participating in the rulemaking proceedings does not make the exhaustion requirement more compelling or negate the valid exception to that requirement asserted by the NRDC.

### III.

The NRDC mounts only a narrow challenge: that the statute adopts an exclusive focus on health-based considerations and that the EPA, therefore, relies on statutorily impermissible factors in using cost and technological feasibility as the basis for withdrawing the 1977 proposed amendments. According to petitioner, the EPA's action was "arbitrary and capricious" under *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). *See* Brief for NRDC at 17–18 & n. 32. We turn then to the question whether the NRDC has met its burden of making this showing. *See San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Commission*, 789 F.2d 26, 37 (D.C. Cir.1986) (en banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). We think it has not.

### A.

This being a question of statutory interpretation, the inquiry of course begins with "the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931

(1979). The statute commands the Administrator to set an "emission standard" for a particular "hazardous air pollutant" so as to "provide[ ] an ample margin of safety to protect the public health." Petitioner argues that these terms are plain and direct the Administrator to consider only factors relating to health. We find the statute less clear than does the petitioner. The mandate "to protect the public health" unambiguously evinces a health-based goal as the primary aim of section 112 of the Act. The complementary standard of providing an "ample margin of safety," however, contemplates some discretion in the regulatory process, thus raising the possibility that the Administrator may properly consider non-health-based factors in deciding upon an appropriate level of regulation.

The statute nowhere defines "ample margin of safety." The Senate Report, however, in discussing a similar requirement in the context of setting ambient air standards under section 109 of the Act, explained the purpose of the "margin of safety" standard as one of affording "a *reasonable* degree of protection ... against hazards which research has not yet identified." S.Rep. No. 1196, 91st Cong., 2d Sess. 10 (1970) (emphasis added). This view comports with the historical use of the term in engineering as "a safety factor ... meant to compensate for uncertainties and variabilities." *See* Hall, *The Control of Toxic Pollutants Under the Federal Water Pollution Control Act Amendments of 1972*, 63 Iowa L.Rev. 609, 629 (1978). In a discussion of the use of identical language in the Federal Water Pollution Control Act, this court has recognized that, in discharging the responsibility to assure "an ample margin of safety," the Administrator faces "a difficult task, indeed, a veritable paradox—calling as it does for knowledge of that which is unknown—[but] ... the term 'margin of safety' is Congress's directive that means be found to carry out the task and to reconcile the paradox." *Environmental Defense Fund v. EPA*, 598 F.2d 62, 81 (D.C. Cir.1978). And while Congress used the modifier "ample" to exhort the Administra-

tor not to allow "the public [or] the environment ... to be exposed to anything resembling the maximum risk" and, therefore, to set a margin "greater than 'normal' or 'adequate,' " Congress still left the EPA "great latitude in meeting its responsibility." *See id.*

Petitioner's assertion that health-based factors constitute the only permissible factors to consider in standard-setting under section 112 appears implausible precisely because the statute brings the Administrator's discretion and judgment to bear on scientific uncertainty. If health were the only permissible consideration, no such discretion would be necessary, for deciding how much uncertainty to allow from a strictly health-based perspective would always lead to the same answer—none. Whenever *any* scientific uncertainty existed about the ill effects of a non-zero level of hazardous air pollutants—and we find it unthinkable that science may ever yield *absolute* certainty of safety in an area so complicated and replete with problems of measurement, modeling, long latency, and the like—any decision informed solely by health, but no other, values would require a prohibition of any emissions. Had Congress intended that result, it could very easily have said so by writing a statute that states that no level of emissions shall be allowed as to which there is any uncertainty. But Congress chose instead to deal with the pervasive nature of scientific uncertainty and the inherent limitations of scientific knowledge by vesting in the Administrator the discretion to deal with uncertainty in each case.

**B.**

Petitioner also argues that the legislative history makes clear Congress' intent to foreclose reliance on non-health-based considerations in standard setting under section 112. The NRDC directs us to the hazardous air pollutants provision of the House bill, which states that "[i]f ... emissions [from any class of new stationary sources] are extremely hazardous to health, no new source of such emissions

shall be constructed or operated, except where (and subject to such conditions as he deems necessary and appropriate) the [administrator] makes a specific exemption with respect to such construction or operation." *See* H.R. 17255, 91st Cong., 2d Sess. § 5(a), 116 Cong.Rec. 19,226 (1970). Thus, as to extremely hazardous emissions, the House bill granted the Administrator a rather open-ended power to exempt a source from the regulation imposed, a power that petitioner presumes to have allowed for exemptions on the basis of non-health considerations.[1] By contrast, petitioner notes, the Senate bill had a tight focus on health, prohibiting emissions "hazardous to the health of persons" and allowing only health-based exceptions to that prohibition. *See* S. 4358, 91st Cong., 2d Sess. § 6(b), 116 Cong.Rec. 32,375 (1970). Because the final version that emerged from conference more closely resembled the Senate than the House bill, and because no express provision for any "specific exemption" survived, the NRDC argues that any feasibility considerations must have been deliberately eliminated. We find this reading of the legislative history strained.

While the original Senate bill is closer than the House bill to the final legislation, neither the House nor the Senate version closely resembles in the aspect relevant here the compromise that emerged from conference. H.R. 17255 dealt only with new stationary sources and, with respect to those, only half of the regulatory scheme dealt with emissions considered "extremely hazardous to health." *See* H.R. 17255, 91st Cong., 2d Sess. § 5(a), 116 Cong.Rec. 19,225–26 (1970). The bill also dealt with new sources the emissions of which could "contribute substantially to endangerment of the public health or welfare," but which were not "extremely hazardous to health," providing for control of such emissions "to the fullest extent compatible with the available technology and economic feasibility." *Id.* In effect, therefore, the House bill amounted to a comprehensive measure generically aimed at dealing with new sources, and only incidentally treated the problem of "extremely hazardous" agents.

Unlike the House bill, the Senate version dealt only with hazardous air pollutants and did so with respect to all stationary sources. The bill proposed a relatively narrow definition of hazardous agents, restricting this category to pollutants "whose presence, chronically or intermittently; in trace concentrations in the ambient air, either alone or in combination with other agents, causes or will cause, or contribute to, an increase in mortality or an increase in serious irreversible or incapacitating reversible damage to health." S. 4358, 91st Cong., 2d Sess. § 6(b), 116 Cong.Rec. 32,375 (1970). Under the scheme set up by the bill, the Administrator was to publish a list of hazardous agents, and follow it by a "proposed prohibition of emissions of each such agent or combination of agents from any stationary source." *Id.* The bill then

---

1. Petitioner's assumption seems correct. The bill prohibited new sources if and because they emitted extremely hazardous pollutants. Allowing exemptions to such prohibitions without specifying the permissible bases for exemption seems to invite consideration of non-health factors, for it would be strange indeed to construct a scheme under which both a prohibition and an exemption from prohibition were available on the basis of the same criterion. To be sure, the Senate bill did set up a system under which the agency was to propose a prohibition of hazardous pollutants, and could refuse to promulgate that prohibition only for health-based reasons, *see infra* pp. 717–18, but this does not make any more plausible the notion that the House bill set up a prohibition and exemption on the sole basis of health. The Senate provision did not set up a system of prohibitions and exemptions, but rather a procedural system to guide the agency. *See* S. 4358, 91st Cong., 2d Sess. § 6(b), 116 Cong.Rec. 32,375 (1970). The agency was to publish a list of hazardous pollutants on the basis of "available material evidence." This list would amount to a proposed prohibition of emissions of the substances on the list. The agency was then to provide notice and a public hearing for each agent or combination of agents included on the list and could refuse to promulgate the prohibition only if a preponderance of the evidence at the hearing refuted the initial basis for the substance's inclusion. Under the House bill, the exemption applied to something still considered "extremely hazardous." We do not see how such an exemption could rest on exclusively health-based considerations.

provided for a hearing, after which the Administrator had to promulgate the prohibition unless a preponderance of evidence demonstrated either "that such agent is not hazardous to the health of persons" or "that departure from prohibition for [a] stationary source will not be hazardous to the health of persons." *Id.* If the Administrator found either such condition to exist, he would then implement an emission standard in lieu of a prohibition. *Id.*

Given these starting points, the inference the petitioner draws from the changes made at conference appears tenuous at best. The final version defines a "hazardous air pollutant" as

> an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness.

Clean Air Amendments of 1970, Pub.L. No. 91–604, § 4(a), 84 Stat. 1676, 1685.[2] The statute instructs the Administrator to publish a list of such pollutants, to conduct hearings, and, unless the hearings show a particular agent not to be a "hazardous air pollutant," to promulgate emissions standards. *Id.* The Administrator must "establish any such standard at the level which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant." *Id.* Petitioner has correctly observed that the law enacted has a closer structural resemblance to the Senate bill, but this offers little, if any, support to petitioners' claim because the Senate bill and the final legislation both were measures to deal with the problem of hazardous air pollutants from all sources. That they would resemble each other more than a House bill meant to deal generically with the problem of all pollution from new sources seems a natural outcome for that reason alone and

thus sheds no light on the intent to adopt particular aspects of the Senate version in the final bill.

Nor do we accept petitioner's contention that the final legislation's failure to allow for "specific exemptions" forecloses consideration of non-health factors. The House bill made such "specific exemptions" available only where the bill *prohibited* the construction or operation of *new* sources. Because the final version enacted contains no prohibitory provision of any kind, failure to include the power to exempt a source from a non-existent blanket prohibition tells us little. It seems more likely that the power to exempt was omitted because the considerations that might have gone into deciding whether and under what conditions to exempt a source, which we think did relate to cost and technology, *see infra* pp. 722–23, were now to be taken into account in deciding on the margin of safety to provide.

Moreover, we believe that the petitioner's reliance on the Senate bill to support its claim about the exclusivity of health-based considerations is misplaced. The emphasis on factors of health in the Senate bill, to the extent that it reveals anything, seems actually to cut against the petitioner's argument. The Senate bill sought to prohibit emissions which were hazardous even in "trace" concentrations and allowed the imposition of emissions standards in other cases. An "emission standard" *"limits* the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k) (1982) (emphasis added). And the definition of "hazardous air pollutants" in the final legislation is clearly broad enough to include substances hazardous to health even in "trace" concentrations. One might conclude, therefore, that Congress was aware of the distinction between a "prohibition" and an "emission standard," and that the ultimate abandonment of the former in the final version of

---

**2.** Congress in the Clean Air Act Amendments of 1977 made a minor alteration in the definition of a "hazardous air pollutant," replacing "may cause, or contribute to" with "causes, or contributes to." Pub.L. No. 95–95, § 401(a), 91 Stat. 685, 791 (1977). This change does not affect the outcome of this case.

the statute may evince an intent not to prohibit emissions of even those hazardous pollutants known to pose a danger to public health in trace amounts. Such a conclusion, of course, would flatly contradict the petitioner's position by indicating a retreat in the final legislation from the exclusive concern with health in the Senate bill.

We do not believe that the final bill precludes a flat prohibition of emissions of a hazardous pollutant. A summary of the provisions of the conference agreement presented by Senator Muskie, the principal Senate sponsor of the Clean Air Amendments of 1970 and the chairman of the Senate conferees, made it clear that the "ample margin of safety" standard might require "a plant ... to close" or "could include emission standards which allowed for no measurable emissions." 116 Cong. Rec. 42,385 (1970). This suggests that, rather than backing away from the protection provided in the Senate bill, the "ample margin of safety" standard provided the flexibility to provide for such protection. A hazardous pollutant demonstrated to have ill effects at trace concentrations may clearly be prohibited under this standard. Absent the explanatory statement by a reliable source about what the conferees intended, however, we have no way of knowing the meaning of the change from specific regulatory commands to a different and more general pattern.

And so it is with the House bill. At conference, the specific provisions of the House bill gave way to a more amorphous standard in which the sources and types of pollution covered were different and the Administrator was given the power to regulate in his sound judgment to protect the public health with a reasonable degree of caution for scientific unknowns. We know of no statement, nor has petitioner directed us to any, that reliably indicates what the conferees intended in replacing the specific regulatory scheme for new sources with the broad standard covering all hazardous pollutants in the final bill. At most, therefore, we find the legislative history of the 1970 Clean Air Amendments ambiguous with respect to what the Administrator

may consider in setting standards for hazardous air pollutants. Some of the history supports an inference that factors other than health might appropriately be taken into account at the Administrator's discretion. Petitioner has not met its burden of showing that section 112(b) permits only the consideration of health.

### C.

On the other side of this controversy, the EPA argues that the 1977 amendments of the Clean Air Act, in the light of Congress' awareness of the 1976 vinyl chloride regulations, amounts to a ratification of the use of cost and technological feasibility considerations in standard setting under section 112. We think this overstates the significance of the legislative history leading up to the Clean Air Act Amendments of 1977. To understand why this is the case, and to appreciate what significance, if any, the 1977 amendments have, we turn to an examination of the history of those amendments.

In 1976, both houses of Congress passed bills purporting to amend the Clean Air Act. The first section of the House bill sought to spur the EPA to take action with respect to specified unregulated pollutants, including vinyl chloride. Within one year of the enactment of the amendments unless the Administrator found after notice and a hearing that the enumerated "substance [would] not cause or contribute to air pollution which [could] reasonably be anticipated to endanger public health," he was to include such substance on the list of pollutants subject to regulation under an ambient air standard pursuant to sections 108 through 110 or under the hazardous air pollutant provisions of section 112, or to include sources of such pollutants on the list of stationary sources governed by section 111's new source performance standards, or to implement some combination of such regulation. H.R. 10498, 94th Cong., 2d Sess. § 101(a), 122 Cong.Rec. 29,- 219 (1976).

In addressing this section of the bill, the Report of the Committee on Interstate and Foreign Commerce discussed the vinyl chloride problem in some detail, emphasizing the dangerous nature of the substance. H.R.Rep. No. 1175, 94th Cong., 2d Sess. 23 (1976). During the development of the bill, the Report noted, the EPA had "proposed emission standards for vinyl chlorides under section 112 of the Act for major sources in the plastics industry," but the Committee retained vinyl chlorides in the proposed legislation to underscore "the Committee's concern that the standards be promulgated without delay and that standards be promulgated for any other significant sources of vinyl chlorides which may exist." Id. at 23–24. The Committee also noted, however, that it "did not intend to specify the degree of emission reduction which should be required," but that "the Administrator should apply the appropriate means and extent of regulation under the existing statutory criteria." Id. at 26. The House passed the bill, leaving section 101 intact.

The Senate bill contained nothing similar. The Conference Committee, however, decided to adopt the House provision regarding unregulated pollutants in relevant part. See H.R.Rep. No. 1742, 94th Cong., 2d Sess. 25–26 (1976). The threat of a total filibuster, however, prevented the Senate from voting on the recommendations of the conferees, and the bill died.

In 1977, both houses reintroduced legislation to amend the Clean Air Act. In the interim between the abandonment of the 1976 amendments and the introduction of the new legislation, the EPA promulgated emission standards for vinyl chloride under section 112 of the Act. See 48 Fed.Reg. 46,560 (1976). In so doing, the EPA had clearly articulated that the regulations adopted reduced vinyl chloride emissions "to the level attainable with best available technology" and that, while "section 112 does not explicitly provide for consideration of costs," the agency believed it could take them into account for the limited purpose of "assur[ing]" that the costs of control technology are not grossly disproportionate to the amount of emission reduction achieved." Id. at 46,560, 46,562. The 1977 House bill contained a provision "nearly identical" to section 101 of the 1976 House bill, differing primarily in its inclusion of radioactive materials and deletion of vinyl chloride from the unregulated pollutants specified. H.R.Rep. No. 294, 95th Cong., 1st Sess. 3 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1080. The Committee explained the deletion of vinyl chloride on the ground that "[d]uring the past year the Administrator [had] promulgated final regulations for the control of vinyl chloride." Id.

The bill passed the House with the unregulated pollutants provision intact. Once again, the Senate bill had no such provision, and, at conference, the House's provision was adopted in relevant part. See H.R.Rep. No. 564, 95th Cong., 1st Sess. 141–42 (1977). The conference recommendations regarding unregulated pollutants passed both houses intact, and President Carter signed the Clean Air Act Amendments into law on August 7, 1977. See Pub.L. No. 95–95, 91 Stat. 685 (1977).

The 1977 legislation comprehensively amended the Clean Air Act, and, in fact, amended the very section that is the subject of this lawsuit. Indeed, that amendment added a further subsection employing substantially the language that EPA had construed in the vinyl chloride regulations to allow consideration of economic and technological feasibility. The relevant amendment to section 112 empowered the Administrator under certain circumstances to forgo use of an emission standard and instead to "promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in his judgment is adequate *to protect the public health ... with an ample margin of safety.*" 42 U.S.C. § 7412(e)(1) (1982) (emphasis added); *see also* Pub.L. No. 95–95, 91 Stat. 685, 703 (1977).[3] Thus, at the time of

---

**3.** The Administrator could employ this alternative kind of regulation when an emission stan-

the 1977 amendments, Congress expressly considered the kind of regulation the EPA should apply to hazardous air pollutants, once identified, and, in so doing, reenacted the standard construed by the EPA in the vinyl chloride regulations.

The House knew of the 1976 regulations,[4] and the failure to clarify the "ample margin of safety" requirement when adopting that language anew in the amendment adding section 112(e) may, therefore, indicate that the EPA has correctly discerned legislative intent. *See United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979). Indeed, if the House's and the House Committee's awareness of what was taking place could confidently be attributed to the entire Congress, the history recited of reactions in 1976 and 1977 would make a considerable case for ratification. But we cannot be certain that Congress was aware of the content of the vinyl chloride regulations,[5] and, therefore, we give the failure to

repudiate the EPA's substantive interpretation of section 112 in those regulations only "modest weight," *see National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 167 (D.C. Cir.1982), and we certainly cannot construe Congress' failure to act in these circumstances as amounting to ratification of the EPA's construction.[6] Congress, in confronting the problem of unregulated pollutants, sought only to provoke some action by the EPA, and in no way aimed to specify the appropriate degree of emission control. That the House knew of the existence of the 1976 standard for vinyl chloride and decided to remove it from the unregulated pollutants list does not, therefore, tell us whether the House examined and became aware of the content of those regulations or the theory or level of the controls imposed. The history of the 1977 amendments may give a scintilla of evidence in support of the agency position here, but it is far short of legislative ratification of the EPA's construction.

dard proved infeasible because "(A) a hazardous pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations." 42 U.S.C. § 7412(e)(2) (1982); Pub.L. No. 95-95, § 110, 91 Stat. 685, 703 (1977).

4. The NRDC argues that because the EPA had promulgated its 1977 Notice of Proposed Rulemaking to amend the vinyl chloride standard, it becomes unclear whether the EPA's cost and technological feasibility interpretation was well-established at the time of the 1977 amendments. We think it was. Although embracing a zero emission goal, the notice explicitly disagreed with criticism that the 1976 regulations placed unwarranted emphasis on technological, rather than health-based goals. 42 Fed.Reg. 28,-154 (1977). More importantly, the proposed rules mandated only "more efficient use of existing control technology at existing plants and more effective controls at new plants." *Id.* The proposal encouraged new technology but refused to ban vinyl chloride because of the drastic implications such a measure would hold for the industry. *Id.* Thus, while more stringent, the proposed regulations did not by any means abandon the EPA's earlier position.

5. The EPA also argues that asbestos regulations based on feasibility considerations had been promulgated pursuant to § 112 prior to the 1977 amendments. We give this no weight because the EPA has given us no indication that Congress had any awareness of the existence of, let alone the content of, those regulations.

6. A court must only sparingly accept arguments based on acquiescence or ratification, for "the Framers of our Constitution deliberately made the passage of legislation difficult—more difficult, for instance, than in parliamentary democracies—[and] Congress simply cannot be obliged affirmatively to correct subsequent administrative interpretations inconsistent with original legislative intent; that is the responsibility of the courts." *Coalition to Preserve the Integrity of American Trademarks v. United States,* 790 F.2d 903, 917 (D.C.Cir.1986). Congressional inaction on a particular point may "betoken[ ] unawareness, preoccupation, or paralysis," rather than tacit assent. *See Zuber v. Allen,* 396 U.S. 168, 185–86 n. 21, 90 S.Ct. 314, 323–24 n. 21, 24 L.Ed.2d 345 (1969). Of course, in the case before us there was more than mere congressional silence; there was affirmative evidence that members of the House knew what EPA was doing and failed to object and that the House Committee employed language that showed a desire to achieve a reduction, but not necessarily the total elimination, of emissions. This is something more than mere failure to enact corrective legislation.

### D.

■ Because the statute does not seem to restrict the Administrator to health-based considerations, and furthermore is ambiguous in that it does not specify what additional factors the Administrator may permissibly take into account in "provid[ing] an ample margin of safety to protect the public health," we may not "simply impose [our] own construction on the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As the Supreme Court said, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* Accordingly, we must uphold the Administrator's construction of the section if it is "a reasonable one," that is, if the Administrator's decision represents "a reasonable policy choice for the agency to make." *Id.* at 845, 104 S.Ct. at 2783.

We believe that the agency in this case has made a reasonable interpretation. Contrary to the Dissent's view of what is at issue here, *see* Dissent *infra* at 734–35, the EPA has not taken the position that it may consider cost and technological feasibility to set a standard that allows a level of emission at or above which evidence has indicated adverse health effects to occur.

Perhaps if the evidence positively demonstrated that a given substance had ill effects and endangered the public health in trace amounts, the EPA could permit no emissions of that pollutant. Only when an area of uncertainty exists does the Administrator "reconcile the paradox" of having to protect against dangers he cannot know by setting standards as strict as possible given both available technology and the requirement that the cost of reduction not be grossly disproportionate to the level achieved. That the area of uncertainty, as with vinyl chloride, covers all non-zero levels of emission does not alter our conclusion.[7]

Since the Administrator has no way of knowing health effects in the range of uncertainty, such considerations as technological and economic feasibility seem natural, perhaps inevitable, choices to inform the Administrator's decision whether he has amply provided for a reasonable degree of safety from the unknown. By emphasizing available technology, the EPA has ensured the maximum regulation against uncertainty without the economic and social displacements that would accompany the closing of an industry or any substantial part of an industry. By ensuring that costs do not become grossly disproportionate to the level of reduction achieved, the EPA guarantees that the consuming public does not

---

7. Petitioner suggests that a deferential approach may not be appropriate in this case because vinyl chloride is "an apparent non-threshold pollutant," and the legislative history makes clear that in such a case Congress intended to allow no measurable emissions. We disagree. Petitioner confuses a "non-threshold pollutant" with an "apparent non-threshold pollutant." The former poses a known hazard at all non-zero levels. The latter may appear to pose a risk at all levels, but, by definition, sufficient data are not available to establish the hazard to public health. We believe that this is precisely the type of uncertainty for which the Administrator was vested with discretion, and even though the Administrator may assume that some risk to health is probable at all concentrations, it is still up to him to decide what constitutes a reasonable degree of protection given that uncertainty does exist.

The Dissent's conclusion that our explanation of the distinction between "non-threshold pollu-

tants" and "apparent nonthreshold pollutants" is "odd" reflects the Dissent's misunderstanding of the definition of "apparent non-threshold pollutant." The Dissent claims that because the EPA recognized that "any atmospheric concentration of VC poses some public health risk," it has also effectively recognized that vinyl chloride is a non-threshold pollutant. *See* Dissent *infra* at 735. This is simply incorrect. The EPA explicitly stated that vinyl chloride was an apparent non-threshold pollutant because it appeared to create a risk to health at all non-zero levels of emissions, but scientific uncertainty made it impossible to establish any definite threshold level of adverse effects to human health. 40 Fed.Reg. at 59,534. Because of the uncertainty as to the threshold level, the EPA "assumed ... that there is no atmospheric concentration that poses absolutely no public health risk." *Id.* It did not conclude that vinyl chloride was a non-threshold pollutant.

pay an excessive price for the marginal benefits of increasing increments of protection against the unknown. We cannot say that this represents an unreasonable weighing of values, especially when no other value readily suggests itself and petitioner supplies none apart from health effects, which in the range of uncertainty are by definition unknowable.

The statute, moreover, explicitly endorses economic values, suggesting that the use of such values to inform ambiguous provisions is not unreasonable. Section 112(e) specifically allows for the use of design, equipment, work practice, and operational standards in lieu of emissions standards where "the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations." 42 U.S.C. § 7412(e)(1) & (2) (1982). Where measurement is impractical because of technological or economic factors, uncertainty as to health effects necessarily exists. It is significant both that uncertainty need not be dissipated if the cost is prohibitive and that requirements other than emissions limits may then be imposed. Congress has thus explicitly expressed its belief that technological and economic values have a place in the regulation of hazardous pollutants.[8] We believe, therefore, that the EPA has acted reasonably in relying on economic and technological feasibility, and we cannot

overturn the withdrawal of the proposed regulations on the basis that the EPA so relied.

**E.**

We think this analysis of the statute demonstrates that Congress did not preclude consideration of economic and technological considerations in the range of emissions where health effects are uncertain. The language Congress used is quite inappropriate to support any such conclusion. Had that result been desired, Congress could easily have stated that where health effects at any level are unknown there shall be zero emissions. That does not even remotely resemble the statute we have before us.

**IV.**

The cases cited by petitioner in support of its claim do not alter our conclusion. No case has squarely addressed what the Administrator may consider in the context of section 112(b)'s command to "provide an ample margin of safety to protect the public health." While some cases have construed similar or identical language to foreclose consideration of technological and economic feasibility, we do not find the reasoning of those cases compelling. Nor do the various dicta petitioner pulls from oth-

---

8. We do not accept the NRDC's argument that Congress' explicitly accounting for economic and technological feasibility in this context suggests a congressional intent that the Administrator consider these values only in deciding what type of regulatory standard to use and not in deciding the level of regulation to apply. Petitioner in effect asserts that Congress knew how to designate such factors and did so expressly where it intended their application. This argument falls short. Congress had very specific notions about when the Administrator could employ design, equipment, work practice, and operational, rather than emission, standards under § 112 and it expressed itself very specifically. *See supra* note 2. That Congress has explicitly provided for certain specific considerations in one detailed subsection does not seem to us a persuasive reason to conclude that failure to specify such considerations when employing a generalized standard in a different subsection forecloses reliance on those factors in fleshing

out that standard. If, elsewhere in the statute, Congress had exhorted the Administrator "to provide an ample margin of safety to protect the public health" and then specifically noted that he could or should consider economic or technological feasibility in making his determination, the failure so to specify in § 112(b)(1) would seem persuasively to foreclose consideration of such factors.

Petitioner makes a similar argument with respect to the provision giving the Administrator the power to grant a two-year waiver for installation of controls imposed under § 112. *See* 42 U.S.C. § 7412(c)(1)(B)(ii) (1982). This argument has no merit. The provision relied on merely tells the outside limit that the Administrator may allow, if necessary, for the imposition of controls. It says nothing about economic or technological feasibility and can in no way be construed as an exclusive avenue for consideration of such factors, as petitioner suggests.

er, related cases persuade us that we have reached the wrong conclusion. It must be remembered that each statute and provision has its own structure and legislative history so that a decision about one cannot be considered to control the interpretation of another. Both similarities and dissimilarities must be considered in deciding how persuasive the analogy is.

Petitioner's strongest case is *Lead Industries Association v. EPA*, 647 F.2d 1130 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). In *Lead Industries*, this court reviewed a challenge by representatives and members of the regulated industry to the promulgation of primary air quality standards for lead under section 109 of the Clean Air Act.[9] Petitioners in that case argued that the Administrator must consider economic impact and technological feasibility in determining the appropriate margin of safety to set under statutory language requiring that the standards "allow[ ] an adequate margin of safety ... to protect the public health," 42 U.S.C. § 7409(b)(1) (1982). *See* 647 F.2d at 1148. The court not only rejected this argument, but also went on to state that section 109 of the Act affirmatively precluded consideration of feasibility in standard setting. The NRDC argues, therefore, that *Lead Industries*, which involved the more permissive language of "adequate," rather than "ample," "margin of safety," compels the conclusion that section 112 precludes consideration of economic and technological feasibility. We think not.

The dicta in *Lead Industries* on which petitioner relies rest upon statutory premises and legislative history inapposite to this case. The court, significantly, did not assert that the statutory *language* precluded consideration of feasibility. In this respect, the opinion stated merely that "[n]othing in its language suggests that the Administrator is to consider economic or technological feasibility in setting ambient air quality standards." 647 F.2d at 1148–49. This says only that the "margin of safety" language does not demand consideration of such factors, something that no party in the case before us disputes.

The *Lead Industries* court did state that the statute on its face does not allow consideration of technological or economic feasibility, but the court based its conclusion on structural aspects of the ambient air pollution provisions not germane here. The court relied on sections of the Act closely related to section 109 in reaching its determination. First, besides "allowing an adequate margin of safety," ambient air standards set under section 109(b) must be based on so-called "air quality criteria," which section 108 defines as comprising several elements, all related to health. *See* 42 U.S.C. § 7408(a)(2)(A), (B), & (C) (1982). The court reasoned that the exclusion of economic and technological feasibility considerations from air quality criteria also foreclosed reliance on such factors in setting the ambient air quality standards based on those criteria. 647 F.2d at 1149 n. 37. The court also relied on the fact that state implementation plans, the means of enforcement of ambient air standards, could not take into account economic and technological feasibility if such consideration interfered with the timely attainment of ambient air standards, and that the Administrator could not consider such fea-

9. The statutory scheme involved in *Lead Industries* regulates air pollutants the "emissions of which, in [the Administrator's] judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare ... [and] the presence of which in the ambient air results from numerous or diverse mobile or stationary sources." 42 U.S.C. § 7408(a)(1) (1982). The Administrator must then publish "air quality criteria" for the pollutants thus listed. *Id.* § 7408(a)(2). Having done this, the Administrator prescribes primary and secondary ambient air standards based on these criteria. *See* 42 U.S.C. § 7409 (1982). Finally, states must adopt state implementation plans to meet these ambient air standards and must submit their plans to the EPA for approval. *See* 42 U.S.C. § 7410 (1982). The scheme under review in this case, regulation of hazardous air pollutants, complements the ambient air standards and covers only those pollutants "to which no ambient air quality standard is applicable." *See* 42 U.S.C. § 7412 (1982).

sibility factors in deciding whether to approve the state plans. *Id.; see* 42 U.S.C. § 7410 (1982). This provided further grounds for the court to believe that Congress simply did not want the economics of pollution control considered in the scheme of ambient air regulations. *See* 647 F.2d at 1149 n. 37.

Moreover, the relevant Senate Report stated flatly that "existing sources of pollutants either should meet the standard of the law or be closed down." 647 F.2d at 1149. This is a far clearer statement than anything in the present case that Congress considered the alternatives and chose closing down sources or even industries rather than allow risks to health.

The substantive standard imposed under the hazardous air pollutants provisions of section 112, by contrast, is not based on criteria that enumerate specific factors to consider, yet pointedly exclude feasibility. Section 112(b)(1)'s command "to provide an ample margin of safety to protect the public health" is self-contained, and the absence of enumerated criteria may well evince a congressional intent for the Administrator to supply reasonable ones. And while the hazardous pollutants provision does all for state implementation plans, section 112, in marked contrast to the regime of ambient air standards, operates through nationally enforced standards; the state plans are permissive and may not interfere with national enforcement of any hazardous pollutant standard. 42 U.S.C. § 7412(d) (1982). No detailed provisions preclusive of technological and economic considerations govern the state plans allowed under section 112; indeed, the Administrator must delegate enforcement and implementation authority to the state (subject to his continuing ability to enforce national standards) if he finds the state plan "adequate." *Id.* Thus, nothing in the scheme of state implementation plans under section 112 demonstrates disfavor for feasibility considerations, and this further distinguishes section 112 from the *Lead Industries* court's interpretation of section 109.

Before turning from *Lead Industries,* we must also address another aspect of that opinion. The *Lead Industries* court did not "discern" in the margin of safety requirement "any congressional intent to require, or even permit, the Administrator to consider economic or technological factors in promulgating air quality standards." 647 F.2d at 1150. In so concluding, the court was fully aware of the nature of the margin of safety standard and, indeed, quoted the Senate Report's description of its purpose as one of providing "a reasonable degree of protection" from the unknown. *Id.* Thus, at first blush, the reasoning of *Lead Industries* may seem at odds with our conclusion that the margin of safety requirement is what allows for such consideration.

Closer examination reveals that our conclusion stands. First, the *Lead Industries* court faced the argument that "margin of safety" required feasibility considerations, and, to the extent that it said the language and history of this requirement did not "even permit" such considerations, the court's statement was not part of the rationale by which it decided the contention before it but amounted only to dicta. Second, these dicta must be understood in the context of where they appear in the *Lead Industries* opinion. The court's discussion of "margin of safety" immediately followed a thoughtful and comprehensive analysis of the legislative history of the ambient air pollution scheme found in sections 108 through 110. This analysis concluded that Congress meant ambient air standards to be affirmatively technology-forcing, and, therefore, consciously excluded any feasibility considerations from their formulation. *See* 647 F.2d at 1149. Accordingly, we read the court's "margin of safety" discussion to mean that, in the light of overwhelming evidence that Congress did not want feasibility considered in setting ambient air standards, the court would not read feasibility considerations into whatever discretion the Administrator may have been given under the "margin of safety" requirement. In other words, the court could not discern any intent to permit

such consideration in the face of other strong evidence to the contrary. No evidence of preclusion of economic and technological considerations has emerged in our examination of section 112 and its history. For that reason, *Lead Industries* does not control this case. Here, for the reasons given, we believe the Administrator is not foreclosed from including these considerations in the exercise of his discretion under the margin of safety requirement of section 112.

Petitioner also cites *Hercules, Inc. v. EPA,* 598 F.2d 91 (D.C. Cir.1978), in support of its claim that the "ample margin of safety" language prohibits consideration of cost and technological factors. *Hercules* involved section 307(a)(4) of the Federal Water Pollution Control Act, which directs the EPA to set standards for toxic water pollutants to provide "an ample margin of safety," *see* 33 U.S.C. § 1317(a)(4) (1982). In relevant part, the decision dealt with an industry petitioner's claim that certain regulations promulgated by the EPA under section 307(a) failed adequately to take feasibility into account. The EPA responded that section 307(a) does not require consideration of any such factor.

The court agreed with the EPA, principally on the ground that section 307(a)(2) enumerated six specific factors to take into account in setting standards for toxic water pollutants, and none involved economic or technological criteria. 598 F.2d at 111. Reinforcing this interpretation was the fact that "[s]ection 307(a)(4) directs EPA to set standards providing 'an ample margin of safety' without any mention of feasibility criteria." *Id.* This, however, does not support the NRDC's position in this case, for *Hercules* merely stands for the proposition that the unadorned appearance of "ample margin of safety" does not *require* economic and technological considerations; the case says nothing about what such language may *permit.*

Nor do we find persuasive the dicta from *Hercules* that the NRDC cites on the subject of section 112 of the Clean Air Act. The *Hercules* court noted similarities between the Federal Water Pollution Control Act Amendments and the Clean Air Amendments of 1970. 598 F.2d at 112. The court then discerned a distinction applicable to both statutes positing "health-based" regulation for toxic water and hazardous air pollutants and "technology-based" regulation for other water and air pollutants. *See id.* The court also noted that "Congress enacted section 112 ... without provision for considerations of feasibility." *Id.* All this is beside the point.

We may accept the health-based/technology-based distinction put forth by the *Hercules* court and still accept the EPA's use of economic and technological feasibility in standard setting under section 112. Health, not technology, is both the starting point and the overriding consideration under the EPA's construction of section 112. The EPA must set its standard at a level which eliminates known adverse health effects of the hazardous substance. It is only when those health effects become unknowable that the EPA turns to economic and technological feasibility to decide the level of emissions to permit. We do not think that this incidental consideration of non-health factors makes the withdrawal of the proposed standards pursuant to the EPA's construction of section 112 technology-based, rather than health-based.

Nor do we believe that the *Hercules* court's casual observation that section 112 makes no provision for feasibility changes the analysis. Section 112 provides discretion in standard-setting, does not affirmatively preclude feasibility considerations, and may, we believe, reasonably accommodate such considerations. In these circumstances, the EPA's construction of section 112 to allow for feasibility considerations is permissible.

In this vein, petitioner sets forth one final argument that we address. Petitioner attempts to erect a policy of clear statement in environmental statutes, such that economic and technological considerations may not enter the calculus of environmental regulation unless the statute expressly so provides. In support of this thesis, peti-

tioner first cites *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 510, 101 S.Ct. 2478, 2491, 69 L.Ed.2d 185 (1981), which states: "When Congress has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute." Petitioner's reliance on this statement is misplaced.

The Court in *American Textile* made the statement quoted in response to an argument that a statute exhorting the Secretary of Labor to consider "feasib[ility]" *required* cost-benefit analysis. In this light, the Court's statement appears to mean that Congress has clearly stated when it has sought to *require* an agency to engage in cost-benefit analysis. Moreover, the EPA has not engaged in that form of analysis here. Cost-benefit analysis means weighing the marginal gain against the marginal cost of each increment of further regulation and then setting the level of regulation at the point at which the latter exceeds the former. In this case, to the extent that the Administrator considers cost at all, he does so only to ensure that costs are not grossly disproportionate to benefits and only when health effects are uncertain. So even if *American Textile* does mean that Congress must clearly announce when it intends to permit cost-benefit analysis, that limitation has no application here.

Petitioner also brings to our notice *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), a case under the Clean Air Amendments of 1970 in which the Supreme Court stated: "Where Congress intended the Administrator to be concerned about economic and technological infeasibility, it expressly so provided." *Id.* at 257 n. 5, 96 S.Ct. at 2525, n. 5; *see also Lead Industries*, 647 F.2d at 1148. Be that as it may, it does not alter our conclusion in this case. The EPA does not contend that Congress intended to require the Administrator to consider economic and technological feasibility in setting standards under section 112. But this does not mean that Congress intended to preclude the Administrator from employing such considerations. It is enough that Con-

gress vested the Administrator with discretion to deal with scientific uncertainty under the "ample margin of safety" standard, and, that, in the absence of congressional direction as to the values the agency should use in guiding that discretion, the Administrator's choice of economic and technological feasibility amounted to a reasonable one. *Chevron* requires no more for us to affirm the agency's construction of the statute.

Accordingly, the decision of the EPA withdrawing the 1977 proposed regulations for vinyl chloride is

*Affirmed.*

J. SKELLY WRIGHT, Senior Circuit Judge, concurring in part and dissenting in part:

Our legal system assigns to the courts the task of saying what the law is, even in those cases where administrative agencies have arrived at interpretations of their own. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Although the Supreme Court has made clear that the federal courts must give agency interpretations substantial deference, *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782, agencies must follow the clear intent of Congress, and the courts must enforce it. The unsupported assertion that a congressional command is in some respect ambiguous is not sufficient, and should not be sufficient, to block all significant judicial review. In the case before the court today, the Environmental Protection Agency has withdrawn a proposed regulation under § 112 of the Clean Air Act on the basis of technological and economic factors Congress clearly removed from the scope of proper deliberation. *See* 42 U.S.C. § 7412(b)(1) (1982); 50 Fed.Reg. at 1184 (Jan. 9, 1985), *reproduced* in Joint Appendix (JA) 48. It is the responsibility

of this court, despite EPA's interpretation, to uphold Congress' clear decision that § 112 emission standards should reflect public health considerations alone.

I concur in Judge Bork's succinct rejection of the statute of limitations and exhaustion arguments made by the intervenor and the agency respectively. But I must respectfully dissent from that portion of the majority opinion that would defer to EPA's consideration of economic feasibility and available technology in its rationale for the withdrawal.

The provision under review here is fairly simple. Section 112 of the Clean Air Act creates an administrative procedure for regulation of "hazardous air pollutants." 42 U.S.C. § 7412. The central language of the provision directs the EPA Administrator to establish an emission standard "at the level which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant." *Id.* § 7412(b)(1)(B). The provision contains no language authorizing the Administrator to consider technological and economic factors. On the contrary, the language on its face clearly makes the Administrator's decision dependent only on health considerations. The majority argues that that the term "judgment" implies that the Administrator has discretion to consider feasibility. But the statute is clear: "judgment" applies only to an "ample margin of safety to protect the public health," and does not make any reference to feasibility considerations, either technological or economic.

Despite this, EPA withdrew its 1977 proposed vinyl chloride standard on feasibility grounds. 50 Fed.Reg. at 1185, JA 49. The new standard is "based on judgments concerning the costs and benefits of the standard to society. The [new] standard is not designed to eliminate V[inyl] C[hloride] exposure risk entirely. Rather, it strikes a balance between public health protection and the cost of that protection." *Id.* at 1183, JA 47. This approach is impermissible for several reasons, each of which I will address in turn.

First, though it may seem reasonable to consider feasibility here, the face of the statute unambiguously precludes it. In § 112 Congress had the public health first, foremost, and apparently *exclusively* in mind. *See* 116 Cong.Rec. 42385 (1970) (comments of Sen. Muskie). Second, the legislative history of the Act is not so ambiguous as to obscure the intent of Congress in § 112, the majority's claim to the contrary notwithstanding. The history of § 112 supports the clear meaning of its language. Finally, EPA's rationale for the withdrawal of the 1977 proposals is not as modest as the majority claims. According to the majority, EPA evaluated economic and technological feasibility in this case only as a last resort, when faced with chronic scientific uncertainty as to the extent of harmful effects of a particular hazardous pollutant. The majority would uphold this use of feasibility considerations. But EPA itself does not limit its consideration of technological and economic feasibility to such an extent, and argues that § 112 gives the Administrator discretion to consider feasibility in all cases. *See* Brief for Respondents at 12–14; 50 Fed.Reg. at 1185, JA 49. By withdrawing the 1977 proposed regulations as infeasible, EPA has contravened the mandate of the Clean Air Act. The proposed vinyl chloride standard should be remanded to the agency for reconsideration and reexamination consistent with the intent of Congress.

I. CONGRESSIONAL INTENT AND SECTION 112

The Supreme Court's *Chevron* opinion, of course, guides our decision here. In that case the Supreme Court upheld an EPA interpretation of the Clean Air Act, 467 U.S. at 839–40, 104 S.Ct. at 2780, and found that, in the absence of clear congressional intent on a particular issue, the courts may only reverse an agency's interpretation of a provision if it is "impermissible" or "unreasonable." *Id.* at 843–44, 104 S.Ct. at 2782. But the Court stressed that, if "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. In the case before this court, the language of the Clean Air Act and its structure clearly show that Congress intended to make § 112 a "health-based" rather than a "technology-based" provision. The majority's discovery of ambiguity in the provision is not borne out by a review of precedent on closely related portions of the Clean Air Act, or by examination of the structure of the Act.

The Clean Air Act of 1970 was largely the result of public concern over the growing destruction of our air quality. *See* Schoenbrod, *Goals Statutes or Rules Statutes: The Case of the Clean Air Act,* 30 U.C.L.A.L.Rev. 740, 744 (1983); 116 Cong. Rec. 42381–82 (remarks of Sen. Muskie). The Air Quality Act of 1967 had failed to improve air quality to any significant extent, Schoenbrod, *supra,* at 745, and in 1970 Congress responded to the problem by enacting a series of substantial amendments to the Act. *Id.* *See* Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676, *codified at* 42 U.S.C. §§ 7401–7626 (1982). In that legislation Congress attempted to stiffen the spines of state clean air administrators, *see* Schoenbrod, *supra,* at 744–47, and to institute a policy of "technology-forcing." The latter policy imposes air quality standards that are unattainable under present technology in order to force industry to produce the equipment necessary for effective control of airborne pollutants. *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 91, 95 S.Ct. 1470, 1487, 43 L.Ed.2d 731 (1974); *see also* Note, *Forcing Technology: The Clean Air Act Experience,* 88 Yale L.J. 1713, 1713–15 (1979). Although "technology forcing" necessarily involves imposition of standards that at present seem unreasonable, Congress clearly made the "hard choice" to follow this policy in search of cleaner air. *Union Electric Co. v. EPA,* 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); 116 Cong.Rec. 42381 (comments of Sen Muskie).

The statute implements the "technology-forcing" policy by refusing to allow the agency to consider technological and economic feasibility in the establishment of most emissions and ambient air standards. Section 108(a)(2), which sets out the grounds for establishment of air quality standards, does not mention technological or economic factors. 42 U.S.C. § 7408(a)(2) (1982). Section 109(b)(1), which directs the EPA Administrator to establish ambient air quality standards "the attainment and maintenance of which in the judgment of the Administrator, based on [criteria not including feasibility] and allowing an adequate margin of safety, are requisite to protect the public health," does not mention technological or economic feasibility. 42 U.S.C. § 7409(b)(1) (1982). This court has held that § 109(b)(1) not only does not *require* the Administrator to consider technological and economic feasibility, but actually bars him from doing so. *Lead Industries Ass'n, Inc. v. EPA,* 647 F.2d 1130, 1150 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).[1] Section 110(a)(2), which directs the EPA Administrator to review state ambient air quality standards, does not mention technological or economic feasibility either. 42 U.S.C. § 7410(a)(2) (1982). The Supreme Court itself has held that § 110(a)(2) does not allow the EPA Administrator to consider economic and technological feasibility when reviewing state ambient air quality standards. *Union Electric,* 427 U.S. at 257–58, 266, 96 S.Ct. at 2525–26, 2529.

Although the intent of Congress to bar consideration of feasibility in the establish-

1. The majority argues that the *Lead Industries* court's language barring consideration of technological or economic feasibility was unnecessary to the judgment in that case, and is therefore nonbinding dicta. Maj. op. at 725. I must disagree. Although it is *formally* distinguishable from the holding, the language barring consideration of feasibility under § 109 is an integral part of the opinion's rationale, as demonstrated by its repeated appearance. *Lead Industries,* 647 F.2d at 1148, 1149, 1150. Furthermore, EPA is clearly bound by this language in the § 109 context. For practical purposes, and certainly for purposes of interpreting parallel provisions of the Clean Air Act, the language barring consideration of feasibility is *not* dicta.

ment of air quality standards is clear in §§ 108, 109 and 110, none of the three sections does so explicitly. Neither does the provision under review here, § 112. 42 U.S.C. § 7412. Section 112 addresses the problem of particularly hazardous pollutants, and merely directs the Administrator to "establish any such standard at the level which in his judgment provides an ample margin of safety to protect the public health." 42 U.S.C. § 7412(b)(1). Congress did not mention feasibility considerations.

The absence of language that embraces feasibility factors in any of these sections, however, is enormously significant when juxtaposed with other provisions of the Act that explicitly allow evaluation of technological and economic feasibility. When Congress wanted feasibility to be a factor in the Administrator's decisions, it knew how to say so. Section 111, for example, explicitly directs the Administrator to base standards of performance for new stationary pollution sources on the best technology available, and fully envisions consideration of technological and economic feasibility in making this determination. 42 U.S.C. § 7411 (1982); *Lead Industries,* 647 F.2d at 1149 n. 37.

In fact, § 112 itself contains two subsections that allow for consideration of technological feasibility under certain *special* circumstances. Section 112(e) gives the Administrator discretion to promulgate a "design, equipment, work practice, or operational standard, or combination thereof" when "it is not feasible to prescribe or enforce an emission standard for control of a hazardous air pollutant." 42 U.S.C. § 7412(e)(1).[2] More importantly, § 112(c)(2) allows the President to grant stationary sources two-year waivers from enforcement of a hazardous pollutant standard "if he finds that the technology to implement such standards is not available *and* the operation of such source is required for reasons of national security." 42 U.S.C. § 7412(c)(2) (emphasis added).

The existence of these two subsections makes little sense unless the section as a whole does not allow the Administrator to consider feasibility. The two provisions set out narrow exceptions to the otherwise strict command of § 112 that the Administrator may only consider *health* factors in setting standards for hazardous pollutants.

Despite the clarity of this scheme, the agency has gone far beyond either of the two § 112 exceptions in its treatment of the vinyl chloride standard. In its 1985 notice withdrawing the proposed 1977 regulations the agency repeatedly states that, because available technology will not suffice to implement such a strict standard, the proposed standard must be withdrawn entirely. 50 Fed.Reg. at 1184 (1st col., 3d col.), 1185 (1st col., 3d col.), 1186 (1st col.), JA 48, 49, 50. The agency is not merely granting a two-year waiver of enforcement to a source critical to national security that is unable to achieve the emission standard due to lack of technology. *See* § 112(c)(2). Nor has the agency found that "it is not feasible to prescribe or enforce" an emission standard for vinyl chloride. *See* § 112(e)(1). The lack of available technology is used to justify the waiver of a strict standard *itself,* across the board.

This action robs § 112(c)(2) of any meaning whatever and sidesteps the narrow provisions of § 112(e)(1). If best available technology could always be considered, as EPA asserts, Congress would have had little reason to place a special "best available technology" exemption in the statute for national security industries. *See* W. RODGERS, ENVIRONMENTAL LAW 277 (1977) ("The occasion for existing sources to argue economics and technology [under § 112] is in a waiver request to the Administrator."). Similarly, Congress must have believed feasibility was not a permissible consideration when it enacted § 112(e)(1) as an amendment to the Act in 1977. If feasibility were generally a permissible consideration, congressional concerns over the feasibility of

---

**2.** Section 112(e)(2) defines "not feasible to prescribe or enforce an emissions standard" to include situations in which (A) control techniques are not available or (B) measurement methodology is impracticable "due to technological or economic limitations." 42 U.S.C. § 7412(e)(2).

standards for some types of pollutants would have been unnecessary. *See* 42 U.S.C. § 7412(e)(1); Pub.L. No. 95–95, 91 STAT. 685, 703 (1977). In short, the structure of the Act and of § 112 clearly deny the Administrator discretion to consider technological and economic feasibility in establishing hazardous pollutant emission standards.

But the structural evidence against the agency's interpretation does not end even with these strong indications of contrary legislative intent. Congress established national ambient air quality standards under §§ 108–110 of the Clean Air Act, and "hazardous air pollutant" emission controls under § 112. As noted above, the courts have consistently read § 108, § 109, and § 110 to preclude the Administrator from considering technological and economic feasibility in setting ambient air quality standards. It makes no sense to allow the Administrator greater latitude in the establishment of standards for pollutants Congress explicitly recognized as highly dangerous than he is allowed in the regulation of less dangerous pollutants. In fact, § 112's language directing the Administrator to establish regulations which "in his judgment provide an ample margin of safety to protect the public health" appears on its face to be *more* strict than § 109's language "*adequate* margin of safety." 42 U.S.C. §§ 7412(b)(1), 7409(b)(1); *Environmental Defense Fund v. EPA*, 598 F.2d 62, 81 (D.C.Cir.1978) (noting that "ample" is more than "adequate" in these provisions of the Clean Air Act).

The majority makes reference to this fact, but fails to explain it. Maj. op. at 724–26. Instead, the majority points out that § 109 explicitly refers to criteria to be considered in setting ambient air quality standards, and specifically fails to mention feasibility, whereas § 112 contains no such list. Maj. op. at 725. While this is certainly true, it does not distinguish congressional intent in § 109 from the intent behind § 112. Section 112 mentions feasibility as a permissible consideration *no more* than does § 109. Granted, unlike § 109, § 112 does not contain a list of crite-

ria to be used by the Administrator. But the absence of a detailed list does not mean § 112 allows the Administrator to consider any factor he pleases. On the contrary, § 112 lists only one proper consideration— the public health. If anything, this focus on a single factor seems to indicate an even stronger bias against feasibility considerations than exists under § 109. Moreover, the language in the two sections is so clearly parallel that if § 109 forbids consideration of feasibility, § 112, absent strong evidence to the contrary, presumptively precludes consideration of feasibility as well. *See Japan Whaling Ass'n v. American Cetacean Society,* —— U.S. ——, 106 S.Ct. 2860, 2870, 92 L.Ed.2d 166 (1986); *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985).

The majority's interpretation muddles what has been a remarkably coherent body of law addressing the proper place of technological and economic feasibility considerations under the Clean Air Act. The role of § 112 within the Clean Air Act as a whole, as well as the internal structure of § 112 itself, make abundantly clear that EPA's evaluation of technological and economic feasibility in its decision to withdraw the 1977 standard was impermissible under the Act.

This is not my view alone. Virtually every commentator to examine the question agrees that Congress prohibited the Administrator from considering technological and economic feasibility in the establishment of § 112 hazardous pollutant emission standards. *See* D. CURRIE, AIR POLLUTION: FEDERAL LAW AND ANALYSIS 3–90 (1984) ("While Congress ought to have allowed costs to be taken into account [in § 112], the EPA has taken excessive liberties [in reading cost considerations into the statute]; the difference between health standards and technology standards is too obvious to be explained away as accidental."); F. ANDERSON, D. MANDELKER & A. TARLOCK, ENVIRONMENTAL PROTECTION: LAW & POLICY 511, 513 (1984) ("[Section] 112 appears to direct EPA to set a highly protective standard that eliminates possible serious risks

without regard to cost. * * * [T]echnical and economic feasibility apparently cannot be taken into account * * *.); R. FINDLEY & D. FARBER, ENVIRONMENTAL LAW 456 (1985) ("[Under § 112] [t]here is no provision for EPA consideration of the cost or difficulty of compliance in determining the emission standards. * * * Section 112 seems to require EPA to set standards which will completely eliminate emissions * * *."); W. RODGERS, ENVIRONMENTAL LAW 277 (1977) ("[T]he administrative judgment on an emission standard for a hazardous pollutant should be dictated solely by public health considerations without regard to the costs, or feasibility of control."); Graham, *The Failure of Agency-Forcing: The Regulation of Airborne Carcinogens Under Section 112 of the Clean Air Act*, 1985 DUKE L.J. 100, 134 ("[T]he EPA has attempted to convert section 112 from a health-based statute to a technology-based statute. * * * The Agency's departure from health-based emission standards is highly questionable * * *."); Schroeder, *Foreword: A Decade of Change in Regulating the Chemical Industry*, 46 LAW AND CONTEMP. PROB. 1, 30–36 (Summer 1983) ("EPA rewrote the statute," EPA's "approach is totally unjustified" and "textually implausible," EPA's interpretation is "dead wrong"). Even a General Accounting Office report "finds little support for EPA's position," and comments that EPA seems to be "at odds with section 112." COMPTR. GEN. OF THE U.S., DELAYS IN EPA'S REGULATION OF HAZARDOUS AIR POLLUTANTS 44, 51 (1983). And in *Hercules, Inc. v. EPA*, 598 F.2d 91 (D.C.Cir.1978), this court itself stated in dicta that "Congress enacted section 112 * * * without provision for considerations of feasibility." *Id.* at 112.

Obviously, none of these comments has any *binding* effect on this court. We are free to ignore them if we wish, and the majority has done so. Nevertheless, the commentators' unanimity on the meaning of § 112 is a powerful indication of the clarity of Congress' intent on this issue. Despite the majority's attempt to show otherwise, Congress made § 112 an unambiguously health-based standard. We need

not consider the legislative history of the provision in any great detail, nor need we consider whether EPA's interpretation is "reasonable" under the second tier of the *Chevron* deference test. Our only duty is to vindicate the clear intention of Congress.

But even if some ambiguity actually surrounded § 112, the EPA's construction of that section still should be invalidated. If Congress had no clear intent on a particular question, and did not explicitly delegate the interpretation to the agency—as the majority claims is the case here—this court has specifically held that a petitioner need only show that the agency's interpretation of the statute is *unreasonable* or *impermissible* in order to prevail. *State of Montana v. Clark*, 749 F.2d 740, 745 (D.C.Cir. 1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *American Cetacean Society v. Baldrige*, 768 F.2d 426, 433 (D.C.Cir.1985), *overruled on other grounds sub. nom. Japan Whaling Ass'n v. American Cetacean Society*, —— U.S. ——, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782. Given the structure of the Clean Air Act and the existence of closely parallel precedent on other provisions within the Act, EPA's interpretation of § 112 simply cannot stand as "permissible."

## II. THE LEGISLATIVE HISTORY OF SECTION 112

The majority, confronted with the clarity of § 112's language in light of the Clean Air Act's overall structure, searches for ambiguity in the voluminous legislative history of the 1970 Clean Air Act Amendments. At the outset, it is important to note that the majority does not find that the legislative history clearly indicates the face of the statute is misleading and that Congress intended economic and technological feasibility to be considered by the Administrator in setting § 112 emission standards. If the legislative history clearly contradicted the language of the statute, perhaps the intent of Congress could legitimately be called "ambiguous," and *Chevron*'s "reasonableness" review of EPA's

interpretation would become appropriate. *See* 467 U.S. at 844, 104 S.Ct. at 2782. The majority, however, stops far short of this evaluation of the legislative history. Indeed, it finds that *"[a]t most* * * * the legislative history of the 1970 Clean Air Amendments [is] ambiguous with respect to what the Administrator may consider * * *."* Maj. op. at 719 (emphasis added).[3]

The majority uses "ambiguous" legislative history, therefore, to indict a provision that is otherwise clear on its face. This is a contorted approach to statutory interpretation. The words of a statute are presumptively conclusive of legislative intent. *State of Montana,* 749 F.2d at 747. Ambiguous legislative history alone cannot overcome that presumption. The majority effectively suggests that judicial deference to administrative agencies is due whenever any ambiguity can be found in the legislative history of a provision, regardless of ambiguity or lack thereof in the actual language and structure of the statute. This approach comes perilously close to establishing an absolute rule of judicial deference to agency interpretations. Virtually all legislative histories of any size are plagued with some degree of contradiction and ambiguity. The majority would impose upon Congress a duty to be clear that goes far beyond what that body, or any human drafter, could possibly hope to achieve on a consistent basis in an age of complex statutory schemes. In our caution not to rob the Executive Branch of its proper role in the constitutional system, we must be extremely careful not to deprive Congress of effective legislative control over agency action.

In any event, the legislative history is not ambiguous. On the contrary, the history of § 112 supports its otherwise clear meaning. Section 112 had its origins in § 115 of Senate bill S. 4358 and § 112 of House bill H.R. 17255. The Senate bill contained stiff provisions that prohibited non-threshold hazardous pollutants, that is, hazardous pollutants for which no safe level of exposure exists. Only health factors were to be considered. *See* S. 4358, 91st Cong., 2d Sess. § 6(b), 116 Cong.Rec. 32375 (1970). The House bill, in contrast, explicitly called for consideration of feasibility in setting emission standards for all new sources of hazardous pollutants. The House version did not attempt to handle existing sources. *See* H.R. 17255, 91st Cong., 2d Sess. § 5(a), 116 Cong.Rec. 19225–26 (1970). The conference committee arrived at a compromise between the two versions, and it is that compromise that is at issue here.

First of all, the final version of § 112 clearly resembles the Senate bill. Like the Senate bill, § 112 regulates *all* emissions, not simply those from new sources. Like the Senate bill, the final version does not include a provision that would give the Administrator broad discretion to grant exceptions from emissions standards. The House bill contained such a provision. *See* H.R. 17255, 91st Cong., 2d Sess. § 5 (1970). The majority denies that the similarity between the Senate bill and the final Act says anything as to whether Congress intended to allow the Administrator to consider economic and technological feasibility in setting the standards. Maj. op. at 718. This overstates the case. If the final bill more closely resembles the Senate bill, then that fact should be taken at face value. The Senate version seems to have substantially prevailed in the conference committee deliberations. As the Senate version forbade consideration of feasibility, we can draw the cautious inference, absent evidence to the contrary, that the final bill does so as well. It would be odd to discover a "rule" of statutory construction that indicated that final bills resembling the version of one house are to be evaluat-

---

**3.** Similarly, the majority discusses whether Congress implicitly ratified EPA's consideration of technological and economic feasibility in its 1977 amendments to the Clean Air Act, and concludes that the history of the 1977 amendments "is far short of legislative ratification of

the EPA's construction." Maj. op. 722. Although this evaluation seems reasonable, it does not obscure the clear congressional intent that underlies § 112, and certainly does not make the language and structure of the Act ambiguous.

ed according to the legislative history of the *other* house's version.

This analysis alone, however, does not illuminate every dim corner of the compromise reached between House and Senate on § 112. Conceivably, the House conferees allowed the Senate to retain its regulation of *all* sources, both new and existing, in exchange for an implicit agreement to allow the Administrator to consider feasibility in setting emission standards. The insertion of the language "ample margin of safety" into the final provision weakly supports this hypothesis, though it is important to reemphasize that this language on its face speaks only to health considerations, and conspicuously fails to make any mention of feasibility. *See* Conference Report, H.R.Rep. No. 1783, 91st Cong., 2d Sess. 195–96 (1970).

But the conference committee added other language to § 112 as well. The committee, after wrangling over the scope of the regulation and the precise language of the command to the Administrator, made a point of inserting § 112(c), the presidential waiver provision. *See* Conference Report, H.R.Rep. No. 1783, 91st Cong., 2d Sess. 197 (1970). This, it seems to me, is the heart of the compromise between House and Senate. The waiver provision, as previously noted, *see* page 730 *supra*, allows for temporary waiver of emission standards if available technology cannot implement the standards at a source of importance to national security. This provision is unnecessary unless the "ample margin of safety" language otherwise bars consideration of available technology. The conference committee added both pieces of language at approximately the same time, a fact that makes it difficult to believe the committee was unaware of the interaction of the two phrases.

Given the resemblance of the final bill to the Senate bill, and the fairly clear evidence of the nature of the compromise between the two houses of Congress provided by the changes made in conference, the legislative history tips toward petitioner's position. As noted above, however, it

is far from clear that even an *ambiguous* legislative history would require us to find for respondents. On the contrary, petitioner's position is amply supported by the face of the statute, which makes resort to the legislative history a subsidiary endeavor. In any event, however, the ambiguity the majority seeks in § 112 can no more be found in its legislative history than in its actual language.

### III. THE MAJORITY'S "UNCERTAINTY" RATIONALE

To explain its inference of broad discretion for the Administrator to consider economic and technological feasibility under § 112, the majority relies heavily on what it regards as the inevitable discretion of the EPA Administrator when faced with "scientific uncertainty." In essence, the majority would create an "uncertainty" exception to the "health-based" character of § 112. The questions raised by the majority's discovery of this exception to the general rule that feasibility is not to be considered in areas where Congress has not authorized such an approach, *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 510, 101 S.Ct. 2478, 2491, 69 L.Ed.2d 185 (1981) (when Congress intends cost-benefit analysis to be used, it says so); *Union Electric*, 427 U.S. at 257 n. 5, 96 S.Ct. at 2525 n. 5 (same), are sufficiently important to warrant separate discussion.

As a threshold matter, the majority's characterization of EPA's rationale for withdrawing the proposed vinyl chloride standard is misleading. Throughout its opinion the majority attempts to narrow EPA's position to more tenable grounds by limiting EPA's claims to the special "uncertainty" question posed by carcinogen regulation. EPA itself has not been so neat. In its notice of proposed regulation, in its briefs, and in its oral argument to this court, EPA never raises the "scientific uncertainty" problem in any significant manner. And with good reason, because it is not EPA's position that only scientific uncertainty justifies consideration of fea-

sibility under § 112. EPA argues that it may engage in cost-benefit analysis, including consideration of technological and economic feasibility, any time it promulgates regulations under § 112. *See* 50 Fed.Reg. at 1183, JA 47 (cost-benefit analysis used to arrive at vinyl chloride standard, because elimination of risk would require prohibition of emissions); Brief for Respondents at 12–14.

EPA's expansive position on its discretion to consider feasibility flows in part, no doubt, from the fact that the uncertainty as to vinyl chloride's low-concentration health effects seems relatively small. *See* 50 Fed. Reg. at 1182, JA 46. In fact, EPA has decided to a *substantial degree of certainty* that the number of lives saved by regulation below the level of the 1976 standards would not be justified by the costs of such regulation. *Id.* (setting out specific, though estimated, figures on risk). As a consequence, the majority's attempt to distinguish between "apparent non-threshold toxics" and "non-threshold toxics" is rather odd. Maj. op. at 722 n. 7. EPA does not focus on any such distinction. On the contrary, EPA explicitly recognizes that "any atmospheric concentration of VC poses some public health risk." 50 Fed.Reg. at 1183, JA 47; *compare* maj. op. at 722 (EPA not refusing to regulate known health risk). In other words, EPA recognizes that vinyl chloride is effectively a non-threshold pollutant.[4] EPA's decision to withdraw its pro-

posed regulations did not spring from concern over uncertainty, but rather rested on the determination that the costs of regulation exceeded its benefits. When Congress enacted § 112 of the Clean Air Act as a health-based provision, it forbade the use of precisely this rationale.

The majority argues that the word "judgment" in § 112(b)(1) implicitly grants the Administrator discretion to consider feasibility in setting emissions standards when the level of harms from pollutant exposure is uncertain. Maj. op. at 716–17. If health were the only factor to be considered, the majority submits, the statute would effectively require that the Administrator ban outright any emissions of pollutants with no safe level of emissions, that is, any "non-threshold" pollutants. If this were the case the Administrator could make only one decision, his discretion would disappear, and the word "judgment" would have no meaning. This would also be true, says the majority, if any uncertainty whatever existed as to the health risks posed by a pollutant. Three responses to this line of reasoning come to mind. I will explain each in turn. First, "non-threshold" pollutants are not the only pollutants § 112 regulates. A substantial part of the Administrator's "judgment" lies in classifying pollutants as threshold or non-threshold, and in establishing specific threshold levels. Second, the Administrator has

---

**4.** The majority, not surprisingly, denies this, and insists that EPA has made a point of distinguishing between "apparent non-threshold" pollutants and "non-threshold" pollutants. Maj. op. at 722. I agree with the majority that such a distinction can be made as an intellectual matter. I do not see, however, that EPA has rested its decision in this case on any such distinction. On the contrary, EPA quite clearly states that it believes vinyl chloride, for all practical purposes, is always hazardous, even though it concedes that at some very low level of exposure adverse health effects might not accrue. Moreover, it seems to me that the majority's distinction is one without a difference. Science may never be able to prove definitively that any given pollutant is harmless at some low concentration. *See* text at 736 *infra*; maj. op. at 716. To do so would be to prove a negative. *See, e.g., Ethyl Corp. v. EPA*, 541 F.2d 1, 25 n. 52 (D.C.Cir.

1976) (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (ultimately *all* scientific "fact" is uncertain at some level). Thus, if we adhere to the majority's definitions of "apparent non-threshold" pollutant and "non-threshold" pollutant, we soon discover that the second category is an empty set. As a consequence, the distinction between the two does not offer any particular insight into EPA's approach to vinyl chloride regulation or, more importantly, into Congress' intent on non-threshold pollutant regulation. On the contrary, it tends to obscure the otherwise obvious fact that EPA has decided, with only a very small degree of uncertainty, that the costs of this regulation exceed its benefits. As EPA is confident enough to make decisions on the assumption that vinyl chloride is for all practical purposes a non-threshold pollutant, we should not hestitate to do so as well.

some discretion to refuse to regulate "insignificant" health risks. Finally, this court has no authority to allow the agency to ignore clear congressional commands, regardless of our opinion of their wisdom.

Congress did not enact § 112(b)(1) to regulate "non-threshold" pollutants alone. The Senate report explicitly adverted to "threshold" pollutants, that is, pollutants safe at some low level of emissions, in its explanation of the scope of the Administrator's discretion. If the Administrator found "that a greater than zero emission [of a hazardous pollutant] could be permitted without presenting a hazard to health," he would be free not to prohibit emissions of that pollutant. S.Rep. No. 1196, 91st Cong., 2d Sess. 20 (1970). Senator Muskie, reflecting back on the legislative process, has said that the Act is based on the assumption that thresholds of safety exist for some hazardous pollutants. *See* Clean Air Act Amendments of 1977, Hearing Before the Subcomm. on Environmental Pollution of the Senate Comm. on Environment and Public Works (pt. 3), 95th Cong., 1st Sess. 8 (1977).

Despite the majority's assertions to the contrary, therefore, the word "judgment" simply does not require a technological and economic feasibility overlay to make sense in this provision. The term "judgment" in § 112(b)(1) gives the Administrator discretion to determine the existence and level of "thresholds" for various pollutants, consistent with the public health. *See Lead Industries,* 647 F.2d at 1152 (EPA position stresses that Administrator's "judgment" regards scientific and technical questions). It does not grant discretion to make wideopen evaluations of technological and economic feasibility. The existence of uncertainty in the determination of threshold levels not only fails to undercut this interpretation of congressional intent, but actually *supports* it. Congress was aware that safe emissions levels might always be scientifically uncertain to some extent, and therefore gave the Administrator discretion to make the final determination of the threshold levels of various pollutants by

evaluating existing scientific evidence. *Id.* at 1152–53.

The majority worries that interpretations of § 112 that do not allow for considerations of feasibility might require the EPA to *prohibit* all emissions of non-threshold pollutants. This could lead, says the majority, to the elimination of entire industries for the sake of negligible and uncertain improvements in the public health. The majority's picture of the calamities that could befall the nation if this court obeys the will of Congress is greatly exaggerated. Though the statute might be read to ban emissions of non-threshold pollutants in every case, I am unconvinced that this would be proper. Congress clearly banned consideration of feasibility under § 112, but it did not clearly require an *absolute* ban on non-threshold pollutant emissions. At times EPA may in fact be bound for health reasons to ban outright all emissions of a given non-threshold pollutant. But it is well established that agencies have some limited discretion to refuse to regulate "insignificant" harms. In *Alabama Power Co. v. Costle,* 636 F.2d 323 (D.C.Cir.1979), for example, Judge Leventhal noted that "[c]ourts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort," *id.* at 360, and that "there is likely a basis for an implication of *de minimis* authority to provide exemption when the burdens of regulation yield a gain of trivial or no value." *Id.* at 360–61; *see also Ethyl Corp. v. EPA,* 541 F.2d 1, 13–14 (D.C.Cir. 1975) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). If, in the judgment of the Administrator, health harms from some low level of emissions are trivial or nonexistent, § 112 does not require a ban.

But that is not the situation presented by this case. Discretion to allow "*de minimis*" emissions of toxic pollutants if harm to the public health would be truly insignificant is a far cry from the EPA's claimed discretion to examine technological and economic feasibility under *all* circumstances, or from the majority's attempt to give EPA license to consider feasibility factors in the

face of any scientific uncertainty whatever. The majority highlights just how sweeping an approach it takes by stating that even if "the area of uncertainty [of harms associated with a toxic], as with vinyl chloride, covers all non-zero levels of emission[, that] does not alter our conclusion [that cost-benefit analysis can be applied when any uncertainty exists]." Maj. op. at 722. Trivial and insignificant harms are not the only harms encompassed by this language.

Finally, even if the statute did require an outright ban on non-threshold pollutant emissions, this court should not set about "correcting" perceived deficiencies in that policy. If Congress has made the decision to impose such costs on society, that is the prerogative of Congress. The Supreme Court made this absolutely clear not long ago, in a situation in some respects not very different from that before us today. See TVA v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978). Though we owe the agency here substantial deference, see Chevron, 467 U.S. at 844, 104 S.Ct. at 2782, that deference pales by comparison with that we owe Congress. Congress has spoken clearly in § 112, and we must obey its command.

The extent to which the majority's grant of wide discretion to the EPA to consider feasibility in the face of "uncertainty" is at loggerheads with congressional intent becomes even more clear if we consider the practical effect of this exception. As has become all too apparent in the last fifteen years, the degree of risk posed by carcinogens is virtually always a matter of some uncertainty. See, e.g., Industrial Union Dep't, AFL–CIO v. American Petroleum Institute, 448 U.S. 607, 613, 100 S.Ct. 2844, 2849, 65 L.Ed.2d 1010 (1980). The majority itself recognizes this fact, admitting that science may never eliminate uncertainty in the evaluation of carcinogenic risk. Maj. op. at 716. The existence of a hazard may be absolutely clear, as in the present case, but the magnitude of that hazard is likely to be imprecise.

Many of the pollutants regulated under § 112, or being considered for regulation under that section, are carcinogens. COMPTR. GEN. OF THE U.S., DELAYS IN EPA'S REGULATION OF HAZARDOUS AIR POLLUTANTS 8–11 (1983); Summary of Data on Specific Pollutants and Cancer Risk Estimates Excerpted from EPA Draft Study, 15 Env't Rep. (BNA) 616, 616–18 (Aug. 10, 1981). As a consequence, if the majority's interpretation of § 112 prevails, many pollutants regulated under this provision will be regulated under a "technology-based" feasibility standard. This would be perverse. Granted, Congress may not have realized the full extent to which carcinogenic risk is subject to intrinsic uncertainty. Nevertheless, Congress was clearly aware that some toxics pose a danger to health at any concentration, requiring the strictest regulation without regard to cost, even if the extent of that danger might be unclear at the third decimal point. See 116 Cong.Rec. 16091 (1970) (comments of Sen. Muskie). Congress did not include any language whatever that indicates it embraced a broad "uncertainty" exception of the sort proposed by the majority. After all, the judgment of the Administrator under § 112 is judgment as to an "ample margin of safety necessary to protect the public health," not judgment as to "a reasonable degree of safety in light of the availability of technology and the costs to be imposed on industry."

Moreover, the majority's willingness to allow for consideration of feasibility if harms are uncertain runs afoul of its own logic. The majority feels that if the exact scope of harm from a hazardous pollutant is not certain, even though the existence of harm may be clear, then "such considerations as technological and economic feasibility seem natural." Maj. op. at 722. EPA should be allowed to weigh these factors against the harms caused by the toxic, argues the majority. If the harms that stem from emission of a hazardous pollutant are uncertain, however, how can they be "weighed" against technological and economic feasibility? The majority proposes an exception to Congress' ban on cost-benefit analysis under § 112 that covers precisely the circumstance where cost-

benefit analysis is of no real assistance to the Administrator. Let us be clear about what the majority would do: Discretion to weigh cost and technology against uncertain levels of harm—even though these harms may be certain at *some* level—is broad discretion not to regulate low-level hazardous pollutants at all. Without solid statistics for harm, the costs of regulation will always dominate the equation. Perhaps this approach can be justified if Congress has explicitly used the language of "reasonableness," *see, e.g., Industrial Union Department*, 448 U.S. at 642, 100 S.Ct. at 2864, but it is hardly acceptable if Congress has gone to considerable lengths to *avoid* such language, as in the case before us.

### III. CONCLUSION

This court should not read the Supreme Court's *Chevron* opinion and general principles of administrative law to allow the insertion of cost-benefit analysis or its equivalent into every statute where Congress makes any technical delegation to an agency. It is the legislature's right, and at times its duty, to vindicate public values even if they are not cost-justified. *See, e.g., TVA v. Hill*, 437 U.S. at 194–95, 98 S.Ct. at 2301–02. Kelman, *An Ethical Critique of Cost-Benefit Analysis*, 1981 REGULATION 33 (Jan./Feb.). In § 112 of the Clean Air Act Congress sought to make "the hard choices" necessary to improve our air quality and to eliminate hazardous pollutants from our air. *Union Electric*, 427 U.S. at 257, 96 S.Ct. at 2525. Congress refused to compromise on matters of public health, and denied the EPA Administrator the discretion to consider technological and economic feasibility in setting hazardous pollutant emissions standards. Simply because the majority feels lack of compromise is unreasonable does not mean the court should enforce its own conceptions of proper policy. *TVA v. Hill*, 437 U.S. at 185, 98 S.Ct. at 2297 ("It is not for us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated.").

This analysis is in no way at odds with the *Chevron* decision. The Supreme Court has directed the lower federal courts to consider the reasonableness of an agency's interpretation of a statute carefully and deferentially if the intent of Congress on the issue is not clear. 467 U.S. at 844, 104 S.Ct. at 2782. As I have argued above, § 112 is as devoid of ambiguity on the permissibility of cost-benefit analysis, given the overall structure of the Clean Air Act, as any statutory provision probably could be. But even accepting, for the sake of argument, the majority's claim that § 112 is somehow unclear, the agency here should still be directed to reconsider its decision. The "reasonableness" of an agency interpretation must be determined in light of the statutory scheme under examination. *Id.* at 845, 104 S.Ct. at 2783. *Chevron*'s "reasonableness" review does not give the courts—and agencies—power to apply "laws" of efficiency and cost-benefit optimality to legislative schemes if the structure and history of those schemes indicate that Congress intended otherwise.

Congress did not enact the Clean Air Act in order to reach a "reasonable" accommodation between air free of hazardous pollutants and economic considerations. Congress moved with grim determination to clear the skies of these toxics, and imposed upon the country a policy of stringent "technology-forcing" regulation as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Electric*, 427 U.S. at 256, 96 S.Ct. at 2525. *Train v. NRDC*, 421 U.S. at 91, 95 S.Ct. at 1487. Today, in diluting the effectiveness of that remedy, this court ignores both the letter of the Act and the uncompromising spirit behind it.

In refusing to read the clear intent of Congress in § 112 of the Clean Air Act, the majority overemphasizes the *Chevron* deference principle and effectively converts the unambiguously "health-based" § 112 into a "technology-based" provision. This metamorphosis not only contravenes congressional intent but flies in the face of an

entire line of this court's precedent, as well as precedent of the Supreme Court. When Congress intended EPA to consider technological and economic feasibility under the Clean Air Act, it clearly stated that fact. I cannot agree with the majority's refusal to overturn EPA's unjustified and unreasonable contrary position, and therefore

I respectfully dissent.