Russell NEWMAN, et al., Plaintiffs,

v.

Sharon Pratt KELLY, et al., Defendants.

Civ. A. No. 93-0994 (CRR).

United States District Court,
District of Columbia.

March 24, 1994.

---

Donovan Leisure, Rogovin, and Schiller, Steven K. Hoffman, William A. Issacson, Legal Counsel, for the Elderly, Michael Schuster, Bruce Vignery, and Patricia DeMichelle, for plaintiffs.

O. Gregory Lewis, Asst. Corp. Counsel, for the District of Columbia, for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

Before the Court are the parties' cross Motions for Summary Judgment in the above-captioned action. The Plaintiffs, four individuals affected by the District of Columbia's nursing home regulations, brought this class action under 42 U.S.C. §§ 1395i–3, 1396r (the Medicare and Medicaid statutes) on behalf of all similarly situated individuals, seeking injunctive and declaratory relief to bring the District's nursing home regulations into compliance with the federal Nursing Home Reform Law of 1987.[1] Because the

---

1. The Nursing Home Reform Law is the name given to the group of amendments to the sections of the Medicare and Medicaid statutes which regulate nursing facilities included in the Omni-

Court concludes that federal law pre-empts local regulations of facilities eligible for Medicare and/or Medicaid benefits based on level of care distinctions, and that the District of Columbia's regulations in this field violate federal law, the Court shall grant the Plaintiff's motion for summary judgement. However, the Court will give the Defendants thirty (30) to bring its regulations into compliance with 42 U.S.C. §§ 1395i–3, 1396r, after which those regulations not in compliance shall be null and void.

The Plaintiffs contend that the District of Columbia ("District" or "D.C.") unlawfully maintains a two-tiered system for regulating nursing facilities which are eligible for reimbursement under Medicare and/or Medicaid. They argue that the District's system distinguishes between "intermediate" and "skilled" care in contravention of the Nursing Home Reform Law, which abolished that distinction. The Plaintiffs further argue that because of the District's two-tiered system they have been subjected to various injuries particularly related to the District's scheme, including damaging transfers between and discharges from different facilities; harmful separations from loved ones; and burdensome denials of the right to live where they choose.

The Defendants contend that the Court should defer to the reasonable exercise of administrative expertise by the D.C. agencies which regulate nursing homes eligible for Medicare and/or Medicaid benefits, because (1) these Defendants do not engage in activities that result in illegal involuntary transfers of residents between and discharges from nursing facilities, and (2) Congress did not intend to pre-empt state action in the field of nursing facility licensure and regulation by enacting amendments to 42 U.S.C. §§ 1395i–3, 1396r.

After giving careful consideration to the parties' pleadings, the applicable law, and the entire record herein, the Court concludes (1) that the District's system causes transfers and discharges of nursing home residents which violate federal law, and (2) that federal law pre-empts the District's regulatory scheme for nursing facilities eligible for reimbursement under Medicare and/or Medicaid to the extent that the scheme enforces level of care distinctions.

## II. FACTS

The individual Plaintiffs in this case are nursing home residents in the District of Columbia who have been affected by specific application of the District's regulatory scheme for nursing facilities eligible for federal reimbursement under Medicare and/or Medicaid. The individual Plaintiffs represent a class of upwards of 3,000 residents in D.C. nursing homes and the unlimited number of future residents who are or will be governed by the Defendants' nursing home regulatory scheme. Briefly, the following are facts surrounding the application of the District's regulatory scheme to the individual Plaintiffs.

Plaintiff Russell Newman resided at Rock Creek Manor when medical problems caused him to be admitted to the Georgetown University Hospital. His medical difficulties required the insertion of a feeding tube. After his medical condition stabilized, he requested through a representative to return to Rock Creek Manor. However, because feeding tube maintenance qualified as a level of care under the D.C. scheme for which Rock Creek Manor was not licensed, that institution could not and would not readmit him.

Plaintiff Ailene Ewell was also a resident of Rock Creek Manor along with her husband of over 50 years, James Ewell. Like Plaintiff Newman, Ms. Ewell was transferred to Georgetown University Hospital where she too had a feeding tube inserted. After this procedure, she was reclassified as needing "skilled" rather than "intermediate" care, as the District's scheme defines those terms. Based on the new level of care she required, Rock Creek Manor attempted to discharge her. Upon petition from Ms. Ewell, a District of Columbia Administrative Law Judge

bus Budget Reform Act of 1987 (OBRA). Those amendments became effective on October 1, 1990.

held that, under federal law, Rock Creek Manor was obligated to readmit her.

In March, 1992, Ms. Ewell was again hospitalized for injuries she received at Rock Creek Manor. After her latest medical problems, Ms. Ewell did not want to return to Rock Creek Manor and sought to be admitted to a new facility. Because of the D.C. scheme, however, she was reclassified as requiring skilled care, while her husband remained classified as needing intermediate care. Because of the difference in the levels of care each spouse required, Ms. Ewell must find a facility that is licensed for both levels of care before she and her husband can move.

Plaintiff John Studevant and his wife resided at J.B. Johnson nursing facility. Because of medical problems, Mr. Studevant was transferred to a local hospital for treatment. When his medical situation stabilized, he was reclassified as needing skilled care. Because of the D.C. scheme, however, J.B. Johnson is licensed solely for intermediate care beds. As a result, Mr. Studevant has not been able to return to his previous home and continue living with his wife.

Plaintiff Mattie Brown was admitted to the Wisconsin Avenue Nursing Home as an intermediate care resident living on the fifth floor. Following an illness, Ms. Brown was reclassified as requiring skilled care and was transferred to a Medicare (skilled care) licensed floor. After a short time, Ms. Brown was reclassified as requiring intermediate care, and facility administrators wanted to return her to the fifth floor. Because she believed her health on the Medicare floor was flourishing, Ms. Brown did not want to return to the fifth floor and challenged the transfer. A District of Columbia Administrative Law Judge refused to authorize her transfer, citing the proposed transfer's non-compliance with federal law, but the administrative hearing in which this ruling was made has not been approved by the agency.

In an affidavit supporting the Plaintiffs' Motion, the D.C. Long Term Care Ombudsman,[2] M. Anne Hart, related that she had been told in 1991 by relevant District agencies that the District was in the process of changing its licensure regulations for nursing facilities to comply with federal law. Plaintiffs' Motion for Preliminary Injunction, Declaration of M. Anne Hart, ¶ 22. Ms. Hart also states that, when she had a conversation in 1992 with an official at a D.C. agency charged with regulating nursing facilities, she was told that the District had given low priority to changing its regulatory system. Id., at ¶ 25.

The Defendants are responsible for the licensing of nursing facilities within the District of Columbia. D.C.Code § 32–1401, et seq. Under the District's licensing scheme, each facility eligible for Medicare or Medicaid reimbursement is licensed accordingly. When the level of care required by a resident changes, the resident's nursing facility must transfer or discharge that resident if that facility is not licensed to provide the appropriate level of care.[3] Under D.C. law, when

---

**2.** The Long Term Care Ombudsman is designated pursuant to the federal Older Americans Act Amendments of 1992, 42 U.S.C. § 3058g, Pub.L. No. 102–375, § 712, 106 Stat. 1277 (September 30, 1992), and the D.C. Long Term Care Ombudsman Act of 1988, D.C.Code § 6–3512, to perform the duties of the D.C. Long Term Care Ombudsman Program. Plaintiffs' Motion for Preliminary Injunction, Declaration of M. Anne Hart, ¶ 1. Those duties include:

(1) to advocate for the rights of nursing facility residents; (2) to investigate and resolve complaints made by or on behalf of nursing facility residents; (3) to monitor the quality of care, services provided and quality of life experienced by nursing facility residents to ensure that the care and services are in accordance with applicable District and federal laws; (4) to analyze, comment on and monitor the development and implementation of federal, state,

and local laws, regulations and governmental policy and actions that pertain to health, safety, welfare and rights of nursing facility residents; and (5) to represent the interests of residents before governmental agencies and seek administrative, legal and other remedies to protect their health, safety, welfare and rights.

Id., at ¶ 3.

**3.** Under the D.C. system, a facility may be either a complete complex in which nursing services are provided or a distinct part of a building separately licensed to provide certain services. 22 D.C.M.R. § 3099.1. Therefore, a discharge may occur if an entire nursing complex is not licensed for a certain level of care, and a transfer may occur within a nursing complex if distinct areas within the complex are licensed for different levels of care.

a facility discharges or transfers a resident, the resident must receive notice of and be given an opportunity to challenge that decision. It is the view of the District agencies which license and regulate nursing facilities that transfers based upon distinctions between levels of care are permissible in light of federal policy.

On July 20, 1992, the Health Care Financing Administration (HCFA) issued an advisory letter to the Defendants on the subject of nursing facility transfer policy. The pertinent sections of the letter state:

> 42 CFR 483.12(a) defines the instances under which [a resident of a nursing facility] may be transferred. Specifically, the resident has the right to remain in the facility unless: (1) a transfer is necessary for his/her welfare and the facility cannot meet the resident's needs; (2) the resident's health has improved to the extent that he/she no longer needs the services provided by the facility ...

> Patients may not be moved between distinct parts of a facility solely for the purpose of manipulating Medicaid or Medicare payment. Such moves are only appropriate if the resident requests to be moved. The resident has the right to refuse such moves and if a transfer is made against the resident's wishes, he/she may grieve the action ...

> .... [W]here facilities are concerned about not being able to transfer residents out of Medicare-certified, distinct-part beds once they no longer require skilled care, we offer the following alternatives. First, the facility could certify the entire facility for Medicare and Medicaid participation. The requirements are essentially the same for both programs. Then, intra-facility of a resident may be accomplished as long as the resident and, if known, the resident's legal representative or interested family member is notified promptly about the change of room or roommate. Second, the facility could ... certif[y] a Medicaid-only distinct part to provide health related care above the level of room and board. In this case, the facility's Medicare-only distinct part would be required to provide skilled care only, and

once the resident no longer required skilled care, a transfer or discharge could be effected to the Medicaid-only distinct part as permitted under 483.12(a)(1).

Defendants' Opposition to Motion for Preliminary Injunction, Attachment 1, at 1–2. Largely based on this letter, Defendants take the position that they may transfer a patient from one facility to another on the grounds that one facility is not licensed to handle the needs of that particular patient.

The Plaintiffs filed this class action in May, 1993, seeking a Declaratory Judgement, Injunctive relief, and Costs and Attorney's fees. The Court subsequently certified the Plaintiffs' class and held a Motions hearing taking both the Plaintiffs' and the Defendants' Motions for Summary Judgment under advisement. Both parties have submitted Local Rule 108(h) Statement of Material Facts to which there is no dispute, and there are no disputed material facts.

## III. DISCUSSION

Summary judgment shall be rendered upon a showing that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court has jurisdiction of this case pursuant to 42 U.S.C. § 1983, because the Plaintiffs have alleged that their federal rights under the Medicare and Medicaid statutes have been violated by the application of the District's nursing home regulatory scheme. *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

Based on the parties' pleadings, the record herein, the facts to which there is no material dispute, and all relevant evidence pertaining to this case, the Court concludes that (1) the federal statutory scheme establishing a single standard of nursing care for all nursing facilities which are eligible for Medicare and Medicaid reimbursement is so pervasive that it pre-empts any local regulation of such facilities based on level of care distinctions; (2) Congress specifically prohibited with clear statutory language the types of transfers and discharges now occurring under the Defendants' scheme of regulation; (3) the federal agency principally charged with the

regulation of nursing facilities has determined that there is a single standard of nursing care for Medicare and Medicaid beneficiaries mandated by federal law; and (4) because the Defendants' agencies have not adopted the findings of their own Administrative Law Judges, the Court will not defer to their interpretation that their scheme does not violate federal law.

## A. THE DISTRICT OF COLUMBIA CONTINUES TO MAINTAIN A TWO–TIERED REGULATORY SYSTEM FOR NURSING HOMES MODELED AFTER THE OLD MEDICAID LAW WHICH MADE DISTINCTIONS BETWEEN "INTERMEDIATE" AND "SKILLED" LEVELS OF CARE.

Since the federal law has taken effect in the District of Columbia, the District has continued to maintain a two-tiered system for licensing and regulating those nursing home facilities eligible to be reimbursed under Medicare and/or Medicaid. The District's system is modeled after the old Medicare/Medicaid statutory scheme, which provided for a lower standard of care under the old Medicaid program than under the more expensive Medicare program. *See Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The District law regulating nursing homes is the Nursing Homes and Community Residence Facilities Protection Act. D.C.Code § 32–1401 *et seq.* The District's nursing home law is enforced by the Department for Consumer and Regulatory Affairs (DCRA), and the U.S. Department of Health and Human Services (HHS) is obligated to certify all federal payments made on behalf of District nursing home residents, including Medicare and Medicaid payments. Within HHS, the certification of these federal payments is performed by the Health Care Financing Administration (HCFA).

At the heart of the District's scheme, its regulations have split nursing home facilities eligible for Medicare or Medicaid reimbursement into skilled care and intermediate care facilities. 22 D.C.M.R. Chs. 32, 33. A "skilled" or "intermediate" facility is defined as either an entire facility or a distinct part of a facility separately operated from the rest of the facility. 22 D.C.M.R. § 3099.1. A skilled nursing facility may be certified under the Medicare and Medicaid programs, although an intermediate care facility is entitled to reimbursement only through Medicaid.

The District currently licenses facilities as exclusively skilled care facilities, exclusively intermediate care facilities, and mixed facilities of various types. Through its Central Referral Board (CRB) or the Delmarva Foundation for Medical Care (Delmarva), the District also classifies each bed and each nursing home resident into the category of intermediate or skilled care. The CRB generally reviews the care level assessments for newly admitted residents, and Delmarva performs care level assessments for residents already admitted to a care facility or temporarily hospitalized residents.

According to Delmarva and CRB criteria, a resident requires intermediate care when, because of a mental or physical condition, he requires health related services which may only be made available by health related services above the level of ordinary room and board. In addition, a resident requires skilled care when such care is needed to prevent deterioration of and improve upon present capacities. Skilled care involves observation and provision of skilled nursing services by a licensed nurse, assessment of the complete needs of the resident by licensed personnel, and the general direction of a licensed physician.

When Delmarva or the CRB changes a resident's level of care, notice is issued to the resident that the residents' needs can best be accommodated in another facility. The DCRA requires that, when a resident's status changes, a facility must transfer that resident to a facility licensed for the appropriate level of care. In the case of a resident who is hospitalized, a facility may be required to discharge such a resident if a bed is unavailable at the appropriate level of care.

234

## B. THE DISTRICT OF COLUMBIA'S REGULATORY SCHEME UNLAWFULLY ENFORCES RESIDENT TRANSFERS AND DISCHARGES WHICH ARE BASED ON REGULATIONS THAT HAVE BEEN PREEMPTED BY FEDERAL LAW.

## 1. THE SPECIFIC FEDERAL STATUTORY LANGUAGE GOVERNING THE REGULATION OF NURSING FACILITIES AMENDED BY THE NURSING HOME REFORM LAW ELIMINATES LEVEL OF CARE DISTINCTIONS ONCE RECOGNIZED UNDER THE MEDICARE/MEDICAID REGULATORY SCHEMES.

■ The Plaintiff's claims arise out of the alleged inconsistency, created by the passage of amendments to the Medicare and Medicaid statutes between the federal and District of Columbia law regulating the licensure and operation of nursing homes eligible for reimbursement under those statutes. Effective October 1, 1990, pursuant to the Nursing Home Reform Law, every nursing home resident covered by Medicaid and/or Medicare is entitled to "skilled nursing care," defined by statute as the level of care necessary to "attain the highest-practicable physical, mental and psycho-social well-being of each resident." 42 U.S.C. §§ 1396r(b)(4)(A), 1395i3(b)(4)(A).

Congress amended the old federal law on nursing homes significantly by giving Medicaid beneficiaries the same rights to "skilled nursing care" as Medicare beneficiaries. Among other changes, these amendments eliminate the previous distinction under Medicaid between "skilled nursing facilities" and "intermediate nursing facilities" by defining the covered facilities under both statutes equally. 42 U.S.C. §§ 1396r(a), 1395i–3(a). In addition, the new law eliminates distinctions in licensed nurse staffing by establishing uniform nursing supervision requirements for all nursing facilities. 42 U.S.C. §§ 1396r(b)(4), 1395i–3(b)(4). The law also requires nurse's aides to complete a training and competency evaluation program before being employed on a full-time basis at a nursing facility. 42 U.S.C. §§ 1396r(b)(5)(A)(i), 1395i–3(b)(5)(A)(i). Finally, it makes uniform the requirement of licensed physician supervision for all nursing facilities. 42 U.S.C. §§ 1396r(b)(6), 1395i–3(b)(6).

In addition to these listed changes, Congress provides a list of "residents' rights" including categories of (1) general rights (e.g., freedom of choice of physician, freedom from restraints, privacy, confidentiality, grievances, and participation in resident and family groups), (2) transfer and discharge rights, (3) access and visitation rights (4) equal access and quality care, and (5) admissions policy. 42 U.S.C. §§ 1396r(c), 1395i–3(c).

Also included in the new federal scheme is a process to give existing nursing homes time to bring their facilities into compliance with the law. Therefore, while the Nursing Home Reform Law was passed in 1987, some sections of the new law did not become effective until as late as October 1, 1990. In addition, states are authorized to grant waivers upon requests from facilities which can show that they qualify under a limited set of circumstances. 42 U.S.C. §§ 1396r(b)(4)(C)(ii), 1395i–3(b)(4)(C)(ii). For example, the new requirement of having a registered nurse on call at a nursing facility for the statutorily mandated minimum periods of time can be delayed upon qualifying request. *Id.; also see* 42 U.S.C. §§ 1396r(b)(4)(C)(i), 1395i–3(b)(4)(C)(i). The purpose of such waivers is to allow time for facilities in areas which may have a more difficult time attracting registered nurses to comply with the new requirements. 42 U.S.C. § 1395–i(b)(4)(C)(ii); *also see* H.Rep. 100–391(I), Committee on the Budget of the House of Representatives, 1st Session, 455 (1987), U.S.Code Cong. & Admin.News 1987, 2313–1. However, Congress understood the potential for evasion of the new law by states which may be hesitant to enforce the new requirements, and included language to prevent delay. 42 U.S.C. §§ 1396r(b)(4)(C)(iii), 1395i–3(b)(4)(C)(iii). Therefore, in circumstances where the new changes are not being implemented, the Secretary of HHS is empowered "to assume and exercise the authority of the State to grant waivers." *Id.*

Viewed in isolation, the difference in the terms "skilled nursing facility" under Medicare and simply "nursing facility" under

Medicaid imply that a level of care distinction may be inferred between the two statutes. While a technical difference does exist in the terms used to describe the facilities eligible for reimbursement under the two schemes, the substantive definition of the facilities covered is the same in both statutes. 42 U.S.C. §§ 1395i–3, 1396r(a)(1). More specifically, the definition of both "nursing facility" under Medicaid and "skilled nursing facility" under Medicare is a facility which primarily provides residents "skilled nursing care and related services for *residents who require medical or nursing care.*" 42 U.S.C. §§ 1396r(a)(1)(A), 1395i–3(a)(1)(A) (emphasis added). The statutory definitions clearly state that "skilled" care must be provided to all residents who require nursing care under either the Medicare or Medicaid reimbursement schemes. There is no indication in either these definitions or the overall statutory schemes of either Medicare or Medicaid that any distinction should continue to be made on the basis of the level of care *provided* by facilities eligible for reimbursement under Medicare or Medicaid. Provision of "skilled nursing care" is required under all sections of each statute.

In addition, there is no indication in these definitions or statutory schemes that any distinction should be made on the basis of the level of skilled care *required* by the resident who is eligible for Medicaid or Medicare benefits. As a result, a resident should not be required to be transferred or discharged from a facility simply because the level of care he or she requires changes. Therefore, the Court finds that term "skilled nursing facility" in § 1395i–3 is the substantial equivalent of the term "nursing facility" in § 1396r.

**2. *THE LEGISLATIVE HISTORY OF THE NURSING HOME REFORM LAW ALSO CLEARLY INDICATES THAT, BECAUSE CONGRESS WAS CONCERNED THAT MEDICAID BENEFICIARIES WERE RECEIVING SUBSTANDARD CARE, IT INTENDED TO ELIMINATE ALL LEVEL OF CARE DISTINCTIONS IN THE PROVISION OF MEDICARE AND MEDICAID BENEFITS.***

The passage of the Nursing Home Reform Law equating the level of benefits received under both Medicare and Medicaid was motivated by Congressional concern that "many nursing homes receiving Medicaid funds [were] providing poor quality care to the elderly and disabled Medicaid beneficiaries." H.Rep 100–391(I), Committee on the Budget of the House of Representatives, 100th Congress, 1st Session, 448, U.S.Code Cong. & Admin.News 1987, 2313–268. Indeed, Congress adopted the results of a study undertaken by the Institute of Medicine (IOM) of the National Academy of Science, which concluded that there was "a broad consensus that government regulation of nursing homes, as it now functions, is not satisfactory because it allows too many marginal or substandard nursing homes to continue in operation." *Id.,* at 452, U.S.Code Cong. & Admin.News 1987, at 2313–272.

The solution to the problem of substandard care, according to Congress, was to make "major revisions" in the existing Medicaid law in the form of an amendment which would "apply a single, uniform set of requirements to all nursing facilities participating in Medicaid, *eliminating the current regulatory and payments distinctions between [skilled and intermediate nursing facilities].*" *Id.,* at 452, 453, U.S.Code Cong. & Admin.News 1987, at 2313–272, 2313–273 (emphasis added). Congress' final goal in implementing the new law was "to improve the quality of care of Medicaid-eligible nursing home residents, and either to bring substandard facilities into compliance with Medicaid quality of care requirements or to exclude them from the program." *Id.,* at 452, U.S.Code Cong. & Admin.News 1987, at 2313–272. In relation to these amendments, Congress stated that "[i]n the view of the Committee, all residents of nursing facilities should receive high quality care, regardless of their source of payment." *Id.,* at 458, U.S.Code Cong. & Admin.News 1987, at 2313–278.

With respect to the provision of resident rights, Congress further stated that "the overriding purpose ... is to improve the quality of care and the quality of life for all nursing facility residents, whether or not eligible for Medicaid." H.Rep. 100–391(I),

Committee on the Budget of the House of Representatives, 100th Congress, 1st Session, 458 (1987), U.S.Code Cong. & Admin.News 1987, 2313–278. In adopting language intended to prohibit transfers based on a change in the level of care, Congress was responding to reports that several nursing facilities had transferred residents from Medicaid-certified beds to Medicare-certified beds to take advantage of the more lucrative Medicare reimbursement formula. H.Rep. 100–881 Committee on the Budget of the House of Representatives, 101st Congress, 2d Session, 124–25 (1990), U.S.Code Cong. & Admin.News 1990, 2017, 2136, 2137. Congress specifically noted that it wanted to put an end to this practice because the transfers "led to confusion, depression and loneliness among the residents affected." *Id.* As a solution, Congress adopted the recommendation of the Health Care Financing Administration (HCFA) that:

> nursing facilities consider having all their beds 'dually certified' at the SNF [skilled nursing facility] level. The Committee concurs in this view and *emphasizes that such action is particularly appropriate now since, effective October 1, 1990, there is no longer a distinction between the two different types of Medicaid-certified beds.*

*Id.* (emphasis added).

Thus it is clear that, in an effort to enhance the welfare of Medicaid beneficiaries, Congress sought to eliminate the previous Medicaid distinctions between "skilled" and "intermediate" care.

3. *TO THE EXTENT THE DEFENDANTS' REGULATIONS ESTABLISH LEVEL OF CARE DISTINCTIONS IN THE LICENSING AND REGULATION OF NURSING FACILITIES, THOSE REGULATIONS ARE PRE–EMPTED BY THE COMPREHENSIVE FEDERAL SCHEME WHICH ESTABLISHES A SINGLE STANDARD OF "SKILLED" CARE FOR ALL MEDICARE AND MEDICAID BENEFICIARIES.*

■ The Defendants do not dispute that their system of licensing nursing facilities creates distinctions between skilled and intermediate levels of care. They also do not dispute that transfers occur within their system based on these levels of care distinctions. The Defendants contend that the distinctions its agencies make between "skilled" and "intermediate" care are not pre-empted by the federal Nursing Home Reform law.

The Court does not agree. It is a well-established rule of law that, when Congress passes a statute, the assumption is that it does not intend to pre-empt local regulation of the field to which that statute is addressed. *Building and Trades Council v. Associated Builders,* —— U.S. ——, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). Indeed, this Court is reluctant to infer that state law is pre-empted " 'unless it conflicts with federal law or would frustrate the federal scheme, or unless [the Court] discern[s] from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' " *Id.* (citation omitted).

Courts, however, have recognized three limited situations in which the presumption against pre-emption may be overcome: (1) where the federal statute expressly states that it pre-empts local regulation; (2) where, from the comprehensiveness of the statutory scheme, the court can imply that Congress intended to pre-empt local regulation ("field pre-emption"); and (3) where the federal statute cannot operate without conflicting with local regulation ("conflicts pre-emption"). *Gade v. National Solid Wastes Management,* —— U.S. ——, ——, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992). The "ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole" by " 'looking to the provisions of the whole law, and to its object and policy.' " *Id.* (citation omitted).

Recently, the Supreme Court analyzed the comprehensive ERISA scheme and decided that it pre-empted the section of the District of Columbia Workers' Compensation Equity Amendment Act which required employers to provide health insurance to employees who were otherwise eligible for workers' compensation benefits. *District of Columbia v. Greater Washington Board of Trade,* —— U.S. ——, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992). In holding that ERISA pre-empted

the District's law, the Supreme Court analyzed both the plain meaning and the overall structure of the ERISA statute. *Id.* The Court also specifically noted that the existence of exemptions within the ERISA scheme "do not limit the pre-emptive sweep of [the relevant portion of the statute] once it is determined that the law in question relates to a covered [insurance] plan." *Id.,* —— U.S. at ——, 113 S.Ct. at 584.

■ Like the ERISA statute recently addressed by the Supreme Court, the Medicare and Medicaid schemes are so pervasive that the Court has no alternative but to hold that those schemes pre-empt local regulation from the field of establishing level of care distinctions in the provision of nursing care under Medicare or Medicaid. For the reasons previously stated in this decision, it is clear from the language of the statute, and the legislative history which informs that language, that Congress intended for there to be a single standard of "skilled nursing care" for all Medicare and Medicaid beneficiaries. Any deviation from that single standard is in contravention of the federal law, and therefore any licensing or regulatory system based on such a deviation, such as the Defendants' scheme in this case, is pre-empted by federal law.

■ Congress has also specifically provided, in clear statutory language, that the transfers in question are not legal. In its comprehensive amendments, Congress included new sections in the Medicaid statutes that establish for all residents the right to refuse a transfer from a skilled facility (i.e. a Medicare facility), to a facility that is not skilled (i.e. a former Medicaid facility). Specifically, Congress added the following language:

> REFUSAL OF CERTAIN TRANSFERS. The right to refuse a transfer to another room within the facility if a purpose of the transfer is to relocate the resident from a portion of the facility that is a skilled nursing facility (for the purposes of this title) to a portion of the facility that is not such a skilled nursing facility.

42 U.S.C. § 1396r(c)(1)(A)(x).

In addition to the right to refuse a transfer, the statute also establishes a resident's right to return to a facility after hospitalization or therapeutic leave. The pertinent section of the statute relates:

> A nursing facility must establish and follow a written policy under which a resident—
>> (I) who is eligible for medical assistance for nursing facility services under a state plan,
>> (II) who is transferred from the facility for hospitalization or therapeutic leave, and
>> (III) whose hospitalization or therapeutic leave exceeds a period paid for under the state plan for the holding of a bed in the facility for the resident,
>
> will be permitted to be readmitted to the facility upon the first availability of a bed
>
> · · ·

42 U.S.C. §§ 1396r(c)(2)(D)(iii).

By giving residents eligible for Medicaid benefits the right both to refuse a transfer from a nursing care facility and to demand a re-transfer to a nursing care facility after hospitalization or therapeutic leave, Congress has sent a clear message that the old distinctions between levels of care provided to Medicare and Medicaid eligible beneficiaries are no longer permitted. The provision of "skilled" care for the individual welfare of each resident, regardless of whether the individual is covered by Medicare or Medicaid, is the primary focus of the statute. Therefore, the District's scheme of regulation, which allows transfers and discharges nursing facility residents based on level of care distinctions, is clearly pre-empted by the comprehensiveness of the federal statutes' protection of the individual resident's welfare and prohibition of transfers or discharges based on level of care distinctions.

4. *THE HCFA LETTER ADVISING THE DEFENDANTS ON TRANSFER POLICY CLEARLY ESTABLISHES THAT, AS THE FEDERAL AGENCY PRINCIPALLY CHARGED WITH REGULATING NURSING FACILITIES, THE HCFA INTERPRETS THE FEDERAL LAW AS MANDATING A SINGLE STANDARD OF CARE FOR BOTH MEDICARE AND MEDICAID BENEFICIARIES.*

■ For support of their position, the Defendants rely heavily on an advisory letter

from the HCFA. The Defendants urge the Court to give substantial deference to the interpretation by their agencies of HCFA regulations which allow a resident to be transferred if "a transfer is necessary for his/her welfare and the facility cannot meet the resident's needs." 42 C.F.R. 483.12(a).

▮ This Court gives considerable deference to reasonable interpretations by local agencies of their statutory mandate when determining whether those agencies are acting pursuant to their authority. *See Arkansas v. Oklahoma*, — U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239; *also see Natural Resources Defense Council v. Environmental Protection Agency*, 804 F.2d 710 (D.C.Cir. 1986). The key question when a statute does not specifically address an issue is whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron v. National Resources Defense*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). In determining whether a particular agency interpretation is permissible, "a court must look to the structure and language of the statute as a whole." *National Railroad Passenger v. Interstate Commerce Commission*, — U.S. ——, ——, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992). However, unreasonable agency interpretations need not be accepted by a reviewing court. *Id.*, — U.S. at ——, 112 S.Ct. at 1402.

The Defendants ask the Court to give deference to a local agency's interpretation of a federal agency's interpretation of a federal statute. It is apparent that the Defendants have focused on the clause "and the facility cannot meet the resident's need" within the HCFA's regulation to infer that level of care distinctions in the local licensing of facilities are acceptable. The Defendants contend that this advice from the HCFA has been reasonably interpreted by their agencies to allow for transfers and discharges based on level of care distinctions.

The Court cannot conclude that the Defendants' agencies have reasonably interpreted the HCFA's interpretation of the statute. As the statutory scheme indicates, Congress' concern in amending these statutes was for the welfare of each nursing home resident

eligible for Medicaid benefits, and not for the protection of a local scheme of licensing and regulating facilities which provide different levels of care. In light of clear congressional intent, the HCFA's regulation must be read with the emphasis on the resident's "welfare" rather than the adequacy of the facility. Therefore, in the Court's view, the proper interpretation of this regulation mandates that, when a facility fails to meet the unified federal nursing home standards under Medicare and Medicaid, a resident may be transferred to a facility which meets those standards in order to protect that resident's welfare.

Furthermore, evidence that the HCFA's regulation has not been reasonably interpreted by the Defendants' agencies exists in sections of the HCFA's letter advising local agencies how to regulate transfers of nursing home residents. In the penultimate paragraph of the HCFA's advisory letter, the agency specifically indicates that the requirements for a facility to be reimbursed under either Medicare or Medicaid "are essentially the same for both programs." Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, Attachment 1, at 2.

In addition, the HCFA includes a hypothetical transfer situation in the letter to illustrate how 42 C.F.R. 483.12(a) operates. The letter's hypothetical specifically addresses a situation in which a facility is "concerned about not being able to transfer residents out of Medicare-certified distinct-part beds once they no longer require skilled care." Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, Attachment 1, at 1. In such a situation under federal law, the letter advises that such facility could either "certify the entire facility for Medicare and Medicaid participation," or "the facility could have certified a Medicare-only distinct part and a Medicaid-only distinct part *to provide health related care above the level of room and board.*" *Id.*, at 2.

Under the first alternative, a nursing facility could freely conduct intra-facility transfers, as long as the notification requirements were met, because the entire facility would be dually-certified and no inter-facility transfer, which challenges compliance with federal

law would have occurred. Under the second alternative, an inter-facility transfer would take place but it would be in compliance with federal law, again with the proper notification, because the Medicaid-only distinct part to which the resident would be transferred would provide the same level of "skilled care" as the Medicare-only distinct part.[4] Contrary to any interpretation by the defendants' agencies, in either alternative, a transfer would not be made based on a level of care distinction and would, therefore, comply with federal law.

5. **BECAUSE IT IS CLEAR FROM THE RECORD THAT ADMINISTRATIVE LAW JUDGES WITHIN THE DEFENDANTS' AGENCIES HAVE PREVIOUSLY REACHED THE SAME INESCAPABLE CONCLUSION THAT THE COURT REACHES TODAY, THE COURT WILL NOT DEFER TO THE JUDGEMENT OF THEIR AGENCIES THAT ITS REGULATIONS ARE IN COMPLIANCE WITH FEDERAL LAW.**

■ The Court finds the Defendants' suggestion that it defer to their agencies' expertise in interpreting the Medicare and Medicaid statutes to be especially bold given that the Defendants' agencies themselves have ignored the findings of their own administrative law judges. On at least two occasions, Administrative Law Judges within the DCRA and the D.C. Department of Hu-

man Services have held that transfers obviated by level of care distinctions in the District's scheme violated federal law.

In the first such instance, on June 20, 1991, an Administrative Law Judge ("ALJ") from the District of Columbia's Department of Human Services held that the Nursing Home Reform Law of 1987

"abolished the distinction between SNF [skilled nursing facility] and ICF [intermediate care facility] under title XIX effective October 1, 1990. While the distinction between the two was retained under title XVIII, *all beds that were previously dually certified as skilled beds under both titles are no longer considered "skilled" beds under title XIX*, notwithstanding the fact that the District's licensure statute still retains such distinction. Title XIX is controlling."

*In the Matter of Mattie Brown*, D.C. Medicaid case # 505–430, Proposed Decision, submitted June 20, 1991 (emphasis in original).

In a second proceeding, an ALJ at the DCRA agreed with the reasoning in *Brown*, and similarly refused to discharge a patient whose level of care under the District's scheme had changed. Citing *Brown*, the ALJ stated:

[I]n 1990, under OBRA provisions, *the U.S. Congress formally abolished these distinctions in favor of mandating that each person's nursing home care should be tailored to his or her individualized care*

---

4. The phrase in the HCFA's letter "above the level of room and board" should be construed as a floor and not as the first level of many subsequent allowable levels of nursing care.

To the extent the Defendants interpreted the HCFA letter to say that transfers may be made based on level of care distinctions "above the level of room and board" and below, of course, hospitalization, that interpretation of the Medicaid statute is unreasonable. The Court does not construe the HCFA's intent to produce such a result. The statute specifically states that the level of care to be provided under Medicaid is the necessary level of "skilled" care to "attain the highest practicable physical, mental, and psycho-social well-being of each resident." 42 U.S.C. § 1396r(b)(4)(A).

The Court interprets the HCFA advisory letter as conclusively saying that the provision of simple "room and board" to residents is not enough to qualify a nursing facility for reimbursement under Medicaid. The facility must provide a

level of care "above the level of room and board" for every resident to be eligible for Medicaid reimbursement. The Court further reads the HCFA letter to implicate the goals and purposes of the Medicaid statute. Therefore, the Court interprets the HCFA letter as advising the Defendants to certify a Medicaid-only distinct part "above the level of room and board" such that the care provided attains the highest practicable physical, mental, and psycho-social well-being of each resident. Stated differently, a medicaid facility which provides services "above the level of room and board" must also provide "skilled" care as required by federal law.

While some Medicaid beneficiaries may need nursing care just above "room and board" others may need such care just below hospitalization. Clearly the HCFA intends and the statute demands that, for a facility to be eligible for Medicaid reimbursement, it must provide this range of care to each of its residents.

*needs,* based upon a comprehensive level of care evaluation.... The District of Columbia is not in compliance with federal law, as stated in the *Brown* decision, where the [DHS] Chief Hearing Officer underscored the need to abolish the former distinction that continued to be made ... in level of care situations, creating an ongoing confusion in the local health care community.

*In the Matter of Ailene Ewell,* DCRA Office of Adjudication case # 92–OAD–007–3 (emphasis added).

Because the federal statutory scheme is so pervasive that it pre-empts any local regulation of Medicare or Medicaid eligible nursing facilities based on level of care distinctions; because Congress specifically prohibited in clear statutory language the types of transfers and discharges now occurring under the Defendants' scheme; because the HCFA's advisory letter to the Defendants clearly indicated that residents eligible for Medicare and/or Medicaid are eligible for the same level of "skilled care"; and because the recommendations of the Defendants' own ALJs has been that the Defendants' scheme violate federal law, the Court concludes that transfers and discharges under the Defendants' nursing home licensing and regulatory scheme made as a result of level of care distinctions are unlawful under federal law.

## IV. CONCLUSION

Accordingly, for all the reasons previously stated, the Court determines that the District of Columbia's scheme for licensing and regulating nursing facilities is not in compliance with the federal law. The Defendants scheme is based on level of care distinctions which were clearly and intentionally eliminated by Congress. Therefore, the Plaintiff's Motion for Summary Judgment must be granted. However, the Court will give the Defendants thirty (30) days to bring its nursing facility regulations into compliance with the single standard of "skilled" care mandated by 42 U.S.C. §§ 1395i–3, 1396r. After thirty days have expired, such of the Defendants' regulations which are not in compliance with the federal law, shall be null and void. The Court shall enter an appropriate Order on this date in accordance with this Opinion.

### ORDER

In accordance with the Court's Opinion filed on this date, and for the reasons stated therein, it is hereby, on this 24 day of March, 1994,

ORDERED that the Plaintiff's Motion for Summary Judgment shall be GRANTED. However, the Defendants shall have until 5:00 P.M. April 22, 1994, to bring their regulations into compliance with 42 U.S.C. §§ 1395i–3, 1396r, after which, such of the Defendants' regulations which are not in compliance shall be null and void; and it is

FURTHER ORDERED that the above-captioned case shall stand DISMISSED, without prejudice; and it is

FURTHER ORDERED that any and all other outstanding motions are hereby rendered MOOT.